**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**WINSTON-SALEM DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **Brokers, Inc.** | ) | **Case No. 04-53451** |
| | ) | |
| Debtor. | ) | |
| _____) | | |
| | ) | |
| **Carlton Eugene Anderson and** | ) | **Ad. Proc. No. 04-06074** |
| **Nelson Kirby Hodge,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **Brokers, Inc. et al,** | ) | |
| | ) | |
| Defendants. | ) | |
| _____) | | |

**MEMORANDUM OPINION**

THIS MATTER coming on before the court on October 25, 2006 in Winston-Salem, North Carolina upon the Motion by Brokers, Inc. for Summary Judgment. Alexander Barrett and J. David Yarbrough appeared on behalf of Brokers, Inc. ("Brokers" or "Debtor"); Joseph R. Beatty and R. Thompson Wright appeared on behalf of Carlton Eugene Anderson; and William E. West, Jr. appeared on behalf of Nelson Kirby Hodge. Having considered the motion, as well as the memorandums of law, affidavits, and arguments of counsel, the court makes the following findings of fact and conclusions of law:

**FACTS**

Brokers, the defendant in this proceeding, is a corporation organized and existing under the laws of North Carolina with its principal place of business in Davidson County, North

Carolina.  Prior to the death of its principal and sole shareholder, Dolen Bowers ("Bowers"),

Brokers operated as a real estate holding, management, and development company with assets

primarily consisting of real property located in Davidson, Guilford, Montgomery, and Randolph

Counties.  Bowers died testate on June 6, 2003.

On November 22, 2004, Brokers filed a voluntary petition for relief under Chapter 11 of

the United States Bankruptcy Code.  On its Petition, Brokers listed real property in the amount of

$19,146,207.00 (including over 100 lots, 96 apartments, and numerous other properties),

personal property in the amount of  $222,859.53, secured claims in the amount of $6,655,779.60,

priority claims in the amount of $374,102.89, and unsecured claims in the amount of

$2,297,781.36.  Since the Petition Date, the Debtor has continued to operate its business as a

debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108 and has been in the process of an

orderly liquidation.

Plaintiff Carlton Eugene Anderson ("Anderson") first began working with Brokers in the

construction business in 1991 or 1992.  On December 10, 1993, Anderson agreed to work with

Brokers to develop the property located at 3001 Meridian Avenue.  This agreement was

allegedly memorialized in a written contract (the "Joint Venture Agreement"); however, the

parties dispute whether this document was ever executed.  The original Joint Venture Agreement

is not in the possession of either Brokers or Anderson.  Anderson has produced a copy of the

document which indicates that Brokers and Anderson entered into a joint venture for the purpose

of developing the real property at 3001 Meridian  Avenue (the "Meridian Project").   The Joint

Venture Agreement provides as follows:

> This is a contract between Brokers Inc. and Gene Anderson for the joint
> venture in developing all the property at 3001 Meridian Ave. It is agreed that

2

Brokers Inc. is to receive an amount of $225,000 plus two-thirds of all profit made from the development of the said property as each sale takes place.  It is agreed the Gene Anderson is to received [sic] one-third of all profit made from the development of said property as each sale takes place after the $225,000 plus any money spent on the property for developing is paid to Brokers Inc. [sic]  Also is to be deeded [sic] one-third interest in the property at that time.

Further, Gene Anderson is to rezone said property to multifamily zoning in order to develop the property to condo sights. [sic]   He is to also repair the house on the property to bring it up to a standard suitable to meet the purposed [sic] development requirements with a $3,000 minimum out of pocket to be spent to reach these goals.  He will be allowed to stay rent free for a minimun [sic] of 6 months while these repairs are being made.  He is to be repayed [sic] for these exspenses [sic] from sales.

Further, if after six months the rezoning is not complete interest will be payed [sic] to Brokers in addition to the previous terms stated at 7% interest per year on the balance out of sale proceeds.  Also at this time additional moneys ($500) will be paid either to Brokers or spent on property each month until property is under development.

It is further understood and agreed that Brokers Inc. and Gene Anderson during this time will build houses for sale in agreed upon locations at the following terms:

1. Brokers Inc.:
   A- To lend money to build houses, buy lots, and pay labor
   B- To charge 1% per month interest on any outstanding money owe [sic] Brokers Inc.
   C- To receive 50% of all profit
   D -To furnish contrators [sic] licenses
2. Gene Anderson
   A- To build and look after the construction of the houses
   B- To receive his labor at an agreed rate and 50% of all profit

The  Meridian Project was never commenced due to zoning issues.  There is no evidence that any of the terms of the Joint Venture Agreement regarding the Meridian Project were ever effectuated.

Despite the failure of the Meridian Project, Anderson continued to work with Brokers.  In his affidavit, Anderson indicates that he was Bowers' "right-hand man in running Brokers' construction projects for about ten years."  Anderson contends that in 1994, the Joint Venture

3

Agreement was orally modified to include construction projects on other properties owned by Brokers. In his deposition, Anderson described this modified agreement as one in which Brokers would furnish capital funds and a contractor's license, while Anderson, who did not have a contractor's license, would "do the work" and get paid for his labor. Anderson contends that Brokers charged 12% interest on any funds advanced to Anderson.

By Anderson's own admissions, Brokers was owned solely by Bowers, and Bowers exerted absolute control over the corporation and its assets. Bowers handled the day-to-day finances of Brokers without the help of Anderson; in fact, Anderson never handled any money on behalf of Brokers during Bowers' lifetime.[1] Anderson testified in his deposition that he would have had to pursue legal remedies to obtain control or assets of Brokers, and that if he had ended his association with Brokers, Bowers would have given Anderson 25-50% of the outstanding amount allegedly owed to him.

The books and records of Brokers treated Anderson as an independent contractor. Accordingly, from 1993 through 2003, Anderson received weekly wages from Brokers in exchange for his labor. At some point during this ten year period, Anderson was appointed vice-president of Brokers.[2] The most he received for this work during any single year was $31,000.00. In addition, on September 14, 1996, Brokers issued a check in the amount of $10,000.00 to Anderson, and the memo on the check indicates "Commission 1030 Ferndale" (the

---

[1] During his deposition, Anderson stated "[Bowers] had control of the money. He had control of the property. If I didn't want to just outright file a lawsuit, I mean, this is the way it went." Dep. of Anderson at p. 50, lines 18-21.

[2] The record is unclear as to whether Anderson became an employee of Brokers at this time or continued to work as an independent contractor.

4

"Ferndale Check"). Anderson asserts that pursuant to their partnership, during this time period

he and Brokers developed numerous properties in Davidson, Randolph and Guilford Counties

including: 124 Payne Road; 123 Westchester; 2801 North Main Street; 2935 South Main Street;

704 Randolph Street Lots 1 through 10; Woodland Subdivision; 4819 Bisbee Road; 3703

McCustin St.; 5831 High Point Road; 1042 Ball Park; 1030 Ball Park; 3068 Green Tree; 5

Maripat Circle; 710 Railroad Street; Eastgate Village; 700 Ferndale Blvd.; and 1004 Ball Park

Drive. Some of the developed properties were sold, but Brokers retained title to many of the

properties and leased them to tenants. In each case, Brokers retained and reinvested the proceeds

into other real estate development projects. Anderson admits that, with the exception of a partial

payment upon the sale of the Ferndale property in 1996 and perhaps other miscellaneous credits,

Brokers did not pay him any of the profits under the Joint Venture Agreement, either upon the

sale of alleged partnership property or from the lease and rental of such properties. Anderson

contends that, despite not being paid any profits, records were kept in the corporate files

regarding his share of any equity for each property. No such records have been located or

produced.

Plaintiff Nelson Kirby Hodge ("Hodge") began working as an employee of Brokers in

1998 and served as an officer of Brokers from 1999-2003. His responsibilities included

supervising Brokers' rental properties, collecting rent, marketing rental properties, and

supervising Brokers' operating budgets. Hodge received a salary for his work and does not

claim that he had any type of a partnership or joint venture agreement with either Brokers or

Bowers. Hodge did not have specific knowledge of a partnership or joint venture agreement

between Brokers and Anderson, but he knew Anderson was in charge of building certain houses

and commercial buildings.

Upon the death of Bowers on June 6, 2003, the ownership of Brokers became a matter in dispute. Hazel Bowers, Bowers' widow, and the estate of Bowers (the "Bowers Estate") each claimed ownership of the stock of Brokers. In addition, Tony Bowers, Bowers' son, asserted that he had some ownership interest in Brokers' stock, although he never made a formal claim. Mark Preston ("Preston") and Calvin Bryant were appointed co-executors of the Bowers Estate. According to Preston's affidavit, he performed accounting services for Brokers during the period from approximately December 2000 through January 29, 2004.

On July 6, 2003, Anderson and Hodge, the only directors of Brokers at that time, held a board meeting at which Anderson was elected President and Hodge was elected Secretary and Treasurer. Scott Gayle ("Gayle") was also retained as corporate counsel. On August 1, 2003, Anderson and Hodge, in their capacities as the directors of Brokers, approved employment contracts (the "Employment Contracts") for themselves in their capacities as officers and employees of Brokers. The Employment Contracts each provided for a term of five years with a base annual salary of $60,000.00, which was to be increased annually. The Employment Contracts provided that either Anderson or Hodge could be terminated for "cause," including willful misconduct, gross incompetence, and any act of fraud, embezzlement, or misappropriation.

On August 7, 2003, Anderson caused Brokers to transfer to himself the sum of $25,000.00. On August 18, 2003, Anderson and Hodge held a special meeting of the board of directors at which they voted in favor of a resolution providing for the sale of a promissory note executed by the Koury Corporation in favor of Brokers in the principal sum of $380,000.00 (the

"Koury Note") to Sherrill and Peggy Morris for the discounted sum of $372,400.00.  Hodge

contends that prior to the sale of the Koury Note, he reviewed Brokers' files and presented

questions to Preston and Anderson about the sale.  Hodge asserts that he indicated to Preston and

Anderson that he felt that the sale price was insufficient. Despite his reservations, Hodge

contends that he signed the minutes authorizing the sale of the Koury Note on the direction of

Preston. The minutes from this special meeting indicate that the sale of the Koury Note was

necessary because Brokers was "in need of an influx of cash to satisfy certain tax obligations

and other needs of the Corporation in the near future."  The proceeds from the sale of the Koury

Note were apparently deposited into Brokers' account at Central Carolina Bank ("CCB"), which

was not Broker's operating account.[3]

On August 26, 2003, Bowers' son, Tony Bowers, was appointed as a director of Brokers.

Immediately after being named as a director, Tony Bowers participated in a special meeting

during which he ratified the actions that had been taken by Anderson and Hodge as directors

since his father's death.   Around this same time, Anderson represented to both Hodge and Tony

Bowers that he was party to a binding partnership agreement with Brokers.  Anderson then

presented Brokers with a request for  payment in the amount of $3,070,258.30 (the "Request for

Payment"), which Anderson claimed was the amount of profit to which he was entitled pursuant

to the Joint Venture Agreement.  Anderson contends that Preston assisted in calculating the

amount owed under the agreement.  Preston, however, states in his affidavit that he was unaware

of the transfers to Anderson and does not indicate that he assisted in this payout.  In the Request

---

[3] According to Preston's affidavit, the CCB account was maintained only for the purpose
of depositing funds sufficient to service the debt owed by Brokers to CCB.

for Payment, Anderson proposed payment of 18% of the total amount due in cash, with the balance due in six months.

On August 27, 2003, Anderson, Hodge, and Tony Bowers caused Brokers to execute a promissory note (the "Note") in favor of Anderson in the original principal sum of $2,517,611.90 which was due in full in six months. The Note was executed by Anderson as President of Brokers. To secure the obligations under the Note, Anderson also executed a deed of trust on behalf of Brokers (the "Deed of Trust") encumbering certain real property owned by Brokers, including 18 different tracts of land, some of which consisted of multiple lots, with a value of over $3.9 million. Hodge signed both the Note and the Deed of Trust as Secretary of Brokers. At the same time, Hodge executed a check from Brokers' account at CCB in favor of Anderson in the amount of $370,000.00. The next day, Brokers paid Anderson an additional $182,646.00 from Brokers' account at Bank of North Carolina. The following week, on September 2, 2003, the directors approved the sale of the Meridian Avenue property to Anderson for $205,000.00. Anderson paid Brokers only $41,000.00 for that property and set off the remaining amount against amounts allegedly owed to him by Brokers.

Hodge contends that during this time period he relied heavily upon the counsel of Gayle, the corporate attorney, and Gayle represented to him that the Joint Venture Agreement was valid. Hodge questioned Gayle regarding the cash transfers to Anderson prior to executing any checks, and he contends that he relied upon the computations of Gayle and Anderson regarding the amount owed under the alleged partnership agreement. Hodge asserts that he asked numerous questions at the August 27, 2003 meeting and was assured by those individuals present that they were satisfied with the approval of the transactions.

8

During the six month period that Anderson acted as President of Brokers, he used also Brokers' credit card to incur $13,000.00 in charges for various personal expenses as well as two visits to casinos in Atlantic City, N.J.  Rather than reimburse Brokers for these personal charges, Anderson set off the amounts against the Note.   Anderson and Hodge continued to act as officers and directors of Brokers until on or about January 28, 2004, at which point Preston and Bryant assumed control.  In August 2004, the heirs of Dolen Bowers  entered into a family settlement agreement establishing that the Bowers Estate was the sole shareholder of Brokers.

Shortly after being terminated from his employment with Brokers, on March 9, 2004, Anderson instituted a lawsuit against Brokers in Guilford County Superior Court asserting claims for breach of partnership agreement, breach of contract to convey real property, breach of employment contract, breach of obligations under the Note and foreclosure on the Deed of Trust,[4] and a partnership accounting and winding down.  Hodge instituted a separate lawsuit against Brokers on April 2, 2004 asserting a claim for breach of his Employment Contract. On May 6, 2004, Brokers filed an answer asserting defenses including the statute of limitations, statute of frauds, and unclean hands.  In addition, Brokers asserted counterclaims for constructive fraud and breach of fiduciary duty, rescission of deed, constructive trust and accounting, and unfair and deceptive acts under N.C. Gen. Stat. § 75-1.1.  Eventually, an order was entered by the Superior Court consolidating the Anderson and Hodge cases.

After filing its bankruptcy petition on November 22, 2004, Brokers filed a Notice of

---

[4] Anderson released the Deed of Trust on April 17, 2006 and his liens, if any, have been transferred to the proceeds of sales of certain real properties.  The Note and Deed of Trust were intended to be in satisfaction of the obligations owed by Brokers under the Joint Venture Agreement; therefore, Anderson's claims stemming from the Joint Venture Agreement appear to be alternative claims.

Removal with the United States District Court for the Middle District of North Carolina and requested that the District Court refer Anderson's claims to this court for resolution and adjudication. The parties engaged in extensive discovery, including depositions, document production, interrogatories, and requests for admission. Brokers filed the present motion for summary judgment on June 30, 2006.

## STANDARD FOR SUMMARY JUDGMENT

The standard for summary judgment is set forth in Fed. R. Civ. P. 56, which is made applicable to this proceeding by Bankruptcy Rule 7056, and provides that the movant will prevail on a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 330 (1986). The movant has the initial burden of establishing that there is an absence of any genuine issue of material fact, and all reasonable inferences must be drawn in favor of the nonmoving party. *Celotex*, 477 U.S. at 330. Once the moving party satisfies this initial burden, the nonmoving party must present some evidence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If the nonmoving party responds satisfactorily, the motion for summary judgment shall be denied, and the case proceeds to trial. However, "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." *Id.* at 249 (citations omitted).

# ANALYSIS

## A.  Breach of Partnership Agreement

Anderson contends that prior to Bowers' death, he and Brokers had formed a partnership pursuant to which Anderson has an enforceable claim against Brokers.  The Uniform Partnership Act defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit."  N.C. Gen.Stat. § 59-36 (2005).  A partnership may be formed without a written or oral contract.  *Williams v. Biscuitville, Inc.*, 40 N.C.App. 405, 407, 253 S.E.2d 18, 20 (1979).  In the absence of an express contract, the existence of a partnership may be established by examining the manner in which the parties conducted business.  *Reddington v. Thomas,* 45 N.C.App. 236, 240, 262 S.E.2d 841, 843 (1980).   A partnership "may be created by the agreement or conduct of the parties, either express or implied." *Eggleston v. Eggleston*, 228 N.C. 668, 674, 47 S.E.2d 243, 247 (1948) (citations omitted).  In determining whether a partnership exists, N.C. Gen. Stat. § 59-37 provides that the following rules apply:

> (1) Except as provided by G.S. 59-46 persons who are not partners as to each other are not partners as to third persons.
> (2) Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or part ownership does not of itself establish a partnership, whether such co-owners do or do not share any profits made by the use of the property.
> (3) The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived.
> (4) The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment:
> > a. As a debt by installments or otherwise,
> > b. As wages of an employee or rent to a landlord,
> > c. As an annuity to a widow or representative of a deceased partner,
> > d. As interest on a loan, though the amount of payment vary with the

11

> profits of the business,
> e. As the consideration for the sale of a goodwill of a business or other property by installments or otherwise.

Co-ownership and the sharing of any actual profits are indispensable requisites for a partnership but do not necessarily establish a partnership. *See, e.g., McGurk v. Moore*, 234 N.C. 248, 252, 67 S.E.2d 53, 56 (1951); *Wilder v. Hobson*, 101 N.C.App. 199, 202, 398 S.E.2d 625, 627 (1990); *Sturm v. Goss*, 90 N.C.App. 326, 330, 368 S.E.2d 399, 401 (1988).

A partnership may be inferred from all the circumstances, so long as the circumstances demonstrate a meeting of the minds with respect to the material terms of the partnership agreement. *Compton v. Kirby*, 157 N.C.App. 1, 11, 577 S.E.2d 905, 912 (2003). Courts must consider all of the facts and circumstances in each particular case in which the existence of a partnership is at issue. *Peed v. Peed,* 72 N.C. App. 549, 325 S.E.2d 275, *cert. denied,* 313 N.C. 604, 330 S.E.2d 612 (1985). The filing of a partnership tax return is significant evidence of the existence of a partnership. *See, e.g., G.R. Little Agency, Inc. v. Jennings*, 88 N.C. App. 107, 110, 362 S.E.2d 807, 810 (1987); *Davis v. Davis*, 58 N.C. App. 25, 31, 293 S.E.2d 268, 272 *disc. review denied*, 307 N.C. 127, 297 S.E.2d 399 (1982). Establishing partnership bank accounts is also an important factor. *See, e.g., In re Vannoy*, 176 B.R. 758, 766 (Bankr. M.D.N.C. 1994); *Reddington v. Thomas*, 45 N.C. App. at 240, 262 S.E.2d at 843. Holding an association out to the public as a partnership and obtaining state licensing as a partnership are factors which show that a partnership exists. *See, e.g., Compton*, 157 N.C. App. at 13-14, 577 S.E.2d at 913-14; *Hines v. Arnold*, 103 N.C. App. 31, 36, 404 S.E.2d 179, 182 (1991). *But see Wilder v. Hobson*, 101 N.C. App. at 202, 398 S.E.2d at 627 (". . . [D]efendants presented evidence negating any implication of co-ownership suggested by the display of 'Safety Taxi's' name and telephone

number"). Similarly, hiring employees and incurring expenses on behalf of the business are factors which may be considered. *In re Vannoy*, 176 B.R. at 766. Contributions of capital by each member of the alleged partnership weighs in favor of the finding of a partnership. *Compton v. Kirby*, 157 N.C. App. at 13, 577 S.E.2d at 913. However, if one person is an employee of another and receives wages, then the two are not partners. *Williams v. Biscuitville, Inc.*, 40 N.C.App. at 407-08, 253 S.E.2d at 20 (finding no partnership where profit sharing feature of plaintiff's compensation was nothing more than a part of his salary); *Zickgraf Hardwood Co. v. Seay*, 60 N.C. App. 128, 133-34, 298 S.E.2d 208, 211 (1982) (holding that wife who performed mainly secretarial and bookkeeping tasks was not a partner, but an employee of her husband and received a share of the profits as wages).

In the present case, Anderson contends that the Joint Venture Agreement establishes all the elements of a partnership. While Anderson concedes that the portion of the Joint Venture Agreement related to the Meridian Project never materialized, Anderson claims that the general terms contained in the last paragraph of the Joint Venture Agreement, which provide that Brokers and Anderson will build houses for sale in agreed upon locations, established a partnership with regard to numerous other projects.

Even if the court assumes, for the purposes of this motion, that the copy of the Joint Venture Agreement produced by Anderson is genuine, it cannot find that the Joint Venture Agreement, standing alone, proves the existence of a partnership between Anderson and Brokers, because it does not establish both co-ownership and the sharing of profits. In *McGurk*, the plaintiff filed an action for an accounting and for profits for a business operated by the defendant. *McGurk v. Moore*, 234 N.C. at 249-50, 67 S.E.2d at 54. The plaintiff in *McGurk*

13

contended that a written agreement which provided that the plaintiff advance funds to be used in the business operated by the defendant and that net profits from the business be divided equally established a partnership. *Id.* The court found that the written agreement provided for profit sharing but not for co-ownership of the business, the relationship under the contract was not a partnership but that of creditor and debtor. *Id.* at 252, 67 S.E.2d at 56. Similarly, in this case, the Joint Venture Agreement provides for the sharing of profits, but it does not contain any provision for the co-ownership of the business.

Aside from the disputed copy of the Joint Venture Agreement, Anderson has presented scant evidence of a partnership: his own affidavit, the Ferndale check, and deposition testimony by Hodge and Tony Bowers that they believed Anderson and Brokers had some type of arrangement but did not know the terms or details of such arrangement. This evidence does not establish the two essential elements of a partnership, co-ownership and the sharing of profits, or any of the other numerous factors that may be considered. While the court recognizes partnership property need not necessarily be titled in the name of the partnership, there is simply no other evidence of co-ownership. Bowers had absolute control over Brokers' property, and there is no evidence of any "partnership" property co-owned and controlled by Brokers and Anderson. The only evidence of any possible profit sharing is the Ferndale Check; however, the face of the check indicates that the funds constitute a commission, not profit sharing. Furthermore, "receipt of a share of profits is not *prima facie* evidence of a partnership where 'such profits were received in payment . . . as the consideration for the sale of . . . property.'" *Qubain v. Granberry*, No. COA06-444, 2007 WL 4026, *2 (N.C. App. Jan. 2, 2007). Aside from the Ferndale Check and perhaps other miscellaneous credits, Anderson concedes that

14

Brokers did not pay any other profits during Bower's lifetime.

A general statement that parties are partners cannot outweigh the conduct of the parties. *Dealers Supply Co., Inc. v. Cheil Industries, Inc.* 348 F. Supp. 2d 579, 589 (M.D.N.C. 2004) (finding that a general statement cannot create a legal partnership if it is against the greater weight of facts alleged). Absent a clear partnership agreement, numerous factors must be present in order for the court to find the existence of a partnership. Recently, in an unpublished case by the North Carolina Court of Appeals, that court addressed the issue of whether a partnership existed. *Qubain v. Granberry*, 2007 WL 4026 at *1. In that case, a party to a real estate venture presented evidence of ownership of land as tenants in common, shared expenses and profits from lot sales, and a joint bank account. *Id.* at *1. Nevertheless, the court found that upon examining all of the circumstances, there was no evidence of a partnership bank account, a partnership tax return, the filing of a certificate of doing business under an assumed name or holding out to the public as a general partnership and complying with state licensing requirements for a business partnership. *Id.* at *2. Presented with a motion for summary judgment, the court found that there was insufficient evidence of a partnership. *Id.*

In this instance, there is no evidence of the filing of partnership tax returns, establishing partnership bank accounts, holding out to the public as a partnership, obtaining state licensing as a partnership, hiring employees and incurring expenses on behalf of the partnership, or contributions of capital by each member of the alleged partnership. The court concludes that Anderson failed to produce substantial evidence so as to create a material issue of fact regarding the existence of a partnership. As a result, Brokers is entitled to summary judgment on Anderson's claim for breach of partnership agreement as well as Anderson's claim for a

partnership accounting.  *See Wilder v. Hobson*, 101 N.C.App. at 202, 398 S.E.2d at 627; *Sturm v. Goss*, 90 N.C. App. at 330, 368 S.E.2d at 401; *Qubain v. Granberry*, 2007 WL 4026, *2;  *Builder Mart of America, Inc. v. First Union Corp.*, 2003 WL 1209673, *1 (N.C.App. 2003). These claims shall be dismissed.

**Breach of contract to convey the Meridian Avenue property**

Anderson has asserted a claim for breach of contract on the basis that, prior to Dolen Bowers death, Brokers promised to convey  real property located at 3001 Meridian Avenue in exchange for renovating that property.   Brokers never conveyed the property.  After Dolen Bowers' death, Anderson purchased the property by paying Brokers $41,000.00 and setting off the remaining amount against amounts allegedly owed to him by Brokers.  Anderson contends that he is entitled to the return of the purchase price he paid or to be compensated for his services.

Pursuant to North Carolina law, "[a]ll contracts to sell or convey any lands, tenements or hereditaments, or any interest in or concerning them ... shall be void unless said contract, or some memorandum or note thereof, be put in writing and signed by the party to be charged therewith . . ."  N.C. Gen. Stat. § 22-2 (2005).  Anderson has produced no writing reflecting any such contract obligating Brokers to transfer the Meridian Avenue property.  Therefore, Brokers is entitled to summary judgment on Anderson's claim for breach of contract to convey the Meridian Avenue property, and that claim shall be dismissed.

**Breach of Fiduciary Duty by Anderson**

Brokers contends that the various transfers of cash, the Meridian Property, the Note and

16

Deed of Trust were approved in breach of Anderson's duties as a director of Brokers.[5]    There is

no dispute that Anderson, as a director of Brokers, did indeed owe Brokers a fiduciary duty.  The

duties of the director of a corporation are set forth in the North Carolina General Statutes, which

provide that a director must perform his or her duties (1) in good faith; (2) with the care of an

ordinarily prudent person; and (3) in a manner that he or she reasonably believes is in best

interests of the corporation.  N.C. Gen. Stat. § 55-8-30 (2005).  Good faith includes the

requirement that a director always discharge the responsibilities of the office with undivided

loyalty to the corporation.  *Meiselman v. Meiselman*, 309 N.C. 279, 307, 307 S.E.2d 551, 568

(1983).

In light of a director's duty of loyalty, a transaction between a director and a corporation

in which the director has a self-interest or conflict is particularly suspect.  North Carolina Gen.

Stat. § 55-8-31 governs conflict of interest transactions, which are those transactions of a

corporation in a director has a direct or indirect interest and, therefore, codifies various

aspects of the duty of loyalty.  N.C. Gen. Stat. § 55-8-31(a) and Official Comment.  Section 55-

8-31 provides that a conflict of interest transaction is not voidable by the corporation solely

because of a conflict of interest if: (1) the material facts of the transaction and the director's

interest were disclosed to the board of directors and the transaction was authorized, approved, or

ratified by a majority of the disinterested directors; (2) the material facts of the transaction and

the director's interest were disclosed to the shareholders, who then authorized, approved, or

ratified the transaction; or (3) the transaction was fair to the corporation.  N.C. Gen. Stat. § 55-8-

---

[5] Brokers also contends that Anderson's Employment Contract was approved in breach of
his fiduciary duty. The court will address the issue of Anderson's Employment Contract
separately.

31(a).  While compliance with § 55-8-31 prevents the automatic voidability of a conflict of interest transaction, the Official Comment to this section makes it clear that such transactions remain subject to attack on other grounds.  Furthermore, implicit in the language of this section is the conclusion that any transaction that fails to comply with § 55-8-31 is automatically voidable.

While Anderson concedes that he had a direct interest in the transactions, he contends that he did indeed comply with § 55-8-31(a)(1) by having Hodge and Tony Bowers, two disinterested directors, approve or ratify the transfer of the Meridian Property, the Note, Deed of Trust, and Employment Contracts.  Brokers argues Anderson has failed to prove that Hodge and Tony Bowers were disinterested directors.   A director has an indirect interest in a transaction if:

> (1) Another entity in which he has a material financial interest or in which he is a general partner is a party to the transaction; or
> (2) Another entity of which he is a director, officer, or trustee is a party to the transaction and the transaction is or should be considered by the board of directors of the corporation.

 § 55-8-31(b).  A friendship between the directors does not result in disinterestedness.  For the purposes of this motion, Anderson has sufficiently established that Hodge and Tony Bowers were disinterested.  There is no evidence to support a finding that Hodge had a material financial interest in, or was an officer, director, or trustee of another entity that was party to the transactions.  Similarly, while Brokers is correct to point out that Tony Bowers may have had an interest in Brokers as a claimant of shares in Brokers, Tony Bowers does not appear to have had a material financial interest in "another entity."  Therefore, for the summary judgment purposes, the court shall presume that Hodge and Tony Bowers were disinterested directors.

18

Anderson must also show that he disclosed the material facts of these transactions to the disinterested directors. The record reflects that Anderson informed Hodge and Tony Bowers that he was party to a partnership agreement with Brokers, and that as a result of that partnership, Brokers owed him $3,070,258.30 in unpaid profits. Anderson and Brokers were not partners, and this fact was certainly material to the approval of the Note and Deed of Trust, as well as the approval of the transfer of the Meridian Property to Anderson.

Furthermore, Anderson cannot show that these transactions were fair to the corporation and, accordingly, complied with § 55-8-31(a)(3). The fairness of a transaction should be evaluated in light of the facts and circumstances as they were known or should have been known at that time. *Boyd v. Howard*, 147 N.C.App. 491, 556 S.E.2d 337 (2001) (citing the Official Comment to N.C. Gen. Stat.§ 55-8-31). The burden of proof rests on the party seeking to sustain the conflict of interest transaction. *Schwartzbach v. Apple Baking Co.*, 109 N.C.App. 216, 220, 426 S.E.2d 438, 441 (1993); *see also*, Russell M. Robinson II, *Robinson on North Carolina Corporation Law* § 15.01(4) (2005).

Even if Anderson believed in good faith that he was a partner with Brokers, the court cannot find that Anderson produced evidence sufficient to raise a genuine issue of material fact as to whether these transactions were fair to the corporation in light of the facts and circumstances at the time. During the six month period following Bowers' death, Anderson caused Brokers to pay to himself over $575,000.00 in cash and execute the Note in the amount of $2,517,611.90. This Note was due in full in six months, despite the fact just a few months prior to the date of the Note, Anderson had entered into a five-year employment contract with Brokers because he felt it would take at least several years to liquidate Brokers' property in an orderly

19

fashion.  Obligating Brokers to pay over $2.5 million dollars in cash in just six months was not fair transaction to Brokers.

Moreover, Anderson admits that Bowers, the former President of Brokers, disputed on behalf of Brokers what amount was due to Anderson, if any. Nevertheless, Anderson caused Brokers to transfer these funds and execute the Note within months of the sole shareholder's death and with full knowledge of an ongoing dispute regarding the ownership of the stock of Brokers.  Anderson also knew that the vast majority of Brokers' assets were in the form of real property, and the corporation had comparatively little cash.  In fact, on August 18, 2003, just ten days prior to executing the Note, Anderson had voted in favor of the sale of the Koury Note for a discounted sum, despite its very favorable terms, in order to raise much needed cash.  Under these circumstances, Anderson's conduct was overreaching and unfair.

Anderson contends that his actions were sheltered by the business judgment rule and North Carolina Gen. Stat. § 55-8-30(d).  Section 55-8-30(d) states that "a director is not liable for any action taken as a director, or any failure to take any action, if he performed the duties of his office in compliance with this section."  N.C. Gen. Stat. § 55-8-30(d)(2005).  The business judgment rule

> operates primarily as a rule of evidence or judicial review and creates, first, an initial evidentiary presumption that in making a decision the directors acted with due care (i.e., on an informed basis) and in good faith in the honest belief that their action was in the best interest of the corporation, and second, absent rebuttal of the initial presumption, a powerful substantive presumption that a decision by a loyal and informed board will not be overturned by a court unless it cannot be attributed to any rational business purpose.

*State ex rel. Long v. ILA Corp.*, 132 N.C. App.587, 602, 513 S.E.2d 812, 821-22 (1999) (quoting

Russell M. Robinson, II, *Robinson on North Carolina Corporation Law,* § 14.6, at 281 (5th ed. 1995)).   Anderson is not entitled to the benefit of the business judgment rule.  Brokers has rebutted any initial presumption that Anderson acted in good faith and with the care of an ordinarily prudent person by showing that the Note, Deed of Trust, and other transfers of property from Brokers to Anderson were transactions in which Anderson had a direct financial interest.  *See, e.g., Weiss v. Temporary Inv. Fund, Inc*., 692 F.2d 928, 947 (3d Cir. 1982), *vacated and remanded on other grounds*, 465 U.S. 1001, 104 S.Ct. 989, 79 L.Ed. 2d 224 (1984) ("Of course, the business judgment rule is inapplicable . . . when the directors' judgment . . . is the product of self-dealing . . . .");  *Joy v. North*, 692 F.2d 880, 886 (2d Cir. 1982), *cert. denied*, 460 U.S. 1051, 103 S.Ct 1498, 75 L.Ed. 2d 930 (1983) ("[The business judgment rule] does not apply in cases . . . tainted by a conflict of interest . . . ."); *In re Fleming Packaging Corp.*, 351 B.R. 626, 634 (Bankr. C.D. Ill. 2006) ("The protection . . . afforded by the business judgment rule does not apply where the plaintiff has made an adequate showing that the directors breached their duty of loyalty . . . by having . . . engaged in self-dealing, made decisions affected by a conflict of interest . . ."); *In re Sheffield Steel Corp.*, 320 B.R. 405, 422 (Bankr. N.D. Okla. 2004) ("[A]llegations of self-dealing disrupt the usual presumption that directors have acted with reasonable business judgment."); *In re Toy King Distribs., Inc.*, 256 B.R. 1, 173 (Bankr. M.D. Fla. 2000) ("The business judgment rule provides no protection to an officer or director who has engaged in self-dealing."); *Behradrezaee v. Dashtara*, 910 A.2d 349, 363 (D.C. 2006) (finding that protections of the business judgment rule are only available to disinterested directors whose conduct otherwise meets the tests of business judgment); *Brehm v. Eisner*, 746 A.3d 244, 253 (Del. 1988) (holding that the business judgment rule does not apply if "directors . . . appear on

21

both sides of a transaction [or] expect to derive any personal financial benefit from it in the sense of self-dealing").

A director stands in a fiduciary relationship to the corporation and may not use his position of trust to further his private interests. *Meiselman v. Meiselman,* 309 N.C. at 308, 307 S.E.2d at 568. In this case, while Brokers was in a state of transition, Anderson placed his own interests first. By engaging in overreaching transactions with the corporation, Anderson breached his duty of loyalty. Thus, the court finds that the transfer of the Meridian Property, the Note, the Deed of Trust, as well as over $575,000.00 in cash and the credit of any debts owed by Anderson in satisfaction of the Note were in violation of Anderson's fiduciary duty as a director of Brokers.

Based upon the foregoing, Brokers is entitled to summary judgment on its claim against Anderson for breach of fiduciary duty, as well as its claim against Anderson for rescission of deed. In addition, given that Anderson caused Brokers to execute the Note, Deed of Trust, and transfer of the Meridian Property in violation of his fiduciary duty as a director, Brokers is entitled to summary judgment on Anderson's claim for breach of obligations under the Note and Deed of Trust.

Lastly, the court finds that Brokers is entitled to summary judgment on its claim for a constructive trust. A constructive trust may be imposed "to prevent the unjust enrichment of the holder of the legal title to property acquired through a breach of duty, fraud, or other circumstances which make it inequitable for him to retain it against the claim of the beneficiary of the constructive trust." *Sara Lee Corp. v. Carter,* 351 N.C. 27, 35, 519 S.E.2d 308, 313 (1999) (internal quotations omitted). Inasmuch as the court has already found that Anderson

acquired property, including cash and real property, through breach of his fiduciary duty, Brokers is entitled to summary judgment on its claim for an accounting of all of the property transferred , including the forgiveness of any debts, to Anderson from Brokers from July 2003 until January 2004 and a constructive trust on any property transferred in breach of his fiduciary duties.

**Breach of Anderson's Employment Contract**

Anderson has asserted a claim against Brokers for breach of his five-year Employment Contract.  The Employment Contract provided that Anderson could be terminated for willful misconduct, gross incompetence, any act of fraud, embezzlement, or misappropriation.  The court has already found that Anderson engaged in self-dealing transactions in breach of his duties to Brokers, and therefore, cause existed to terminate Anderson's employment.  *Jay Group, Ltd. v. Glasgow,* 139 N.C.App. 595, 600, 534 S.E.2d 233, 237 (2000) (". . . both the breach of fiduciary duty claim and the breach of duty of loyalty claim are encompassed within a claim for constructive fraud").  The court need not reach the question as to whether the Employment Contract is voidable pursuant to § 55-8-31.  Brokers is entitled to summary judgment, and Anderson's claim shall be dismissed.

**Breach of fiduciary duty by Hodge**

Brokers also contends that, like Anderson, Hodge breached his fiduciary duty as a director of Brokers in approving or executing transfers of property to Anderson.  Aside from his own Employment Contract,[6] Hodge, unlike Anderson, did not engage in self-dealing transactions with Brokers.  While Brokers has made allegations that Hodge acted in self-interest, it has not

---

[6] The court will address issues regarding the Employment Contract in a separate section.

23

presented evidence to substantiate this allegation.  Thus, the court must view Hodge's conduct in light of the general duties set forth in § 55-8-30: the discharge of his duties in good faith, in a manner he reasonably believed to be in the best interests of Brokers, and with the care of an ordinarily prudent person in like position.

As to good faith, Hodge asserts that he discharged his duties as a director of Brokers honestly, conscientiously, with undivided loyalty, as well as to the best of his abilities.  Issues regarding intent and motive in the context of whether a director acted in good faith to further the interests of the corporation frequently depend upon the credibility of witnesses and, therefore, are not easily decided on summary judgment.  *Clark v. B.H. Holland Co.*, 852 F. Supp. 1268 (E.D.N.C. 1994).  In this case, there is insufficient evidence to support a finding on summary judgment that Hodge did not act in good faith as a matter of law, and as a result, is not entitled to the application of the business judgment rule.

Hodge has also presented some evidence that he had a reasonable belief that a binding partnership agreement existed between Anderson and Brokers.  This belief was based upon Anderson's representations, the alleged representations of corporate counsel, and his personal knowledge of Bower's references to some type of agreement between Anderson and Brokers prior to his death.  Absent actual knowledge to the contrary, a director is entitled to rely on information, opinions, reports, or statements  of officers or employees of the corporation and of legal counsel.  N.C. Gen. Stat. § 55-8-30(b)-(c).  Accordingly, the court will not find, on summary judgment, that Hodge's belief that a binding partnership agreement existed between Anderson and Brokers was unreasonable.

If Hodge reasonably believed in the existence of a partnership agreement, it may have

been reasonable for him to believe that it was in Brokers' best interest to make voluntary arrangements to pay its indebtedness to Anderson.  In addition, Hodge has presented some evidence that he examined corporate records prior to making decisions as a director and consulted with Gayle, Brokers' attorney, and Preston, Brokers' accountant.   Therefore, the court finds that there is an issue of material fact as to whether Hodge acted with the care of an ordinarily prudent person, in a manner that he reasonably believed to be in the best interests of Brokers, and in good faith.  Brokers' motion for summary judgment on its claim against Hodge for breach of fiduciary duty shall be denied.

Brokers has asserted a claim against Hodge for constructive trust and accounting as a result of his misfeasance.  Even if the court were to find that Hodge breached his fiduciary duty as a director of Brokers, Brokers has not presented evidence that property of Brokers was transferred to Hodge.  Moreover, Brokers' motion and briefs do not address this claim. Therefore, Brokers' motion for summary judgment on its claim against Hodge for constructive trust and accounting is denied.

**Brokers's Claims against Anderson and Hodge for unfair and deceptive acts under Ch 75**

Under North Carolina law, the elements of a claim of unfair and deceptive trade practices ("UDTP") are: "(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business."  N.C. Gen. Stat. § 75-1.1 (2005); *see also, Spartan Leasing v. Pollard*, 101 N.C. App. 450, 460-61, 400 S.E.2d 476, 482 (1991).  An act or practice is unfair "when it offends established public policy"or "is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers."  *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 68, 529 S.E.2d

25

676, 681 (2000).

North Carolina courts have held that conduct constituting a breach of fiduciary duty and constructive fraud is sufficient to support a UDTP claim so long as the other elements of UDTP are also present. *See Wilson v. Wilson Cook-Medical, Inc*., 720 F. Supp. 533, 542 (M.D.N.C. 1989); *Compton v. Kirby*, 157 N.C. App. at 20; *Spence v. Spaulding & Perkins Ltd.*, 82 N.C. App. 665, 668, 347 S.E.2d 864, 866 (1986). An essential inquiry of a UDTP claim is whether the behavior at issue affected commerce. To "affect commerce," a defendant's allegedly deceptive acts must have a tangible effect on the marketplace. *Esposito v. Talbert & Bright, Inc*., __ S.E.2d __ (N.C. App. Feb. 20, 2007) (upholding a denial of summary judgment when no effect on commerce was alleged beyond an employee's relationship with his employer); *Durling v. King*, 146 N.C. App. 483, 488-89 (2001); *HAJMM v. House of Raeford Farms*, 328 N.C. 578, 592-93, 403 S.E.2d 483, 492 (1991) ("Plaintiff must first establish that defendants' conduct was 'in or affecting commerce' before the question of unfairness or deception arises"). Beyond the bare allegations of its complaint, Brokers has forecast no evidence that the conduct of Anderson and Hodge had any impact on commerce or the marketplace.[7] Therefore, summary judgment must be denied on the UDTP claims as to both Anderson and Hodge.

**The Employment Contract of Hodge**

Brokers asserts that, because these were self-dealing transactions, Hodge bears the burden of showing that the Employment Contract was fair. The court finds that Hodge presented evidence sufficient to raise genuine issues of material fact regarding whether this conflict of

---

[7] Although Brokers alleged UDTP claims in its complaint, these claims were not mentioned in its brief in support of summary judgment.

26

interest transaction was properly approved by a majority of the disinterested directors.  There is substantial evidence that Anderson and Tony Bowers were disinterested directors with respect to their approval of Hodge's Employment Contract, and therefore, the transaction complied with the requirements of § 55-8-31.

Furthermore, there is a genuine issue of material fact as to whether Hodge's Employment Contract was fair to the corporation, and whether it was entered into in good faith, with the care of an ordinarily prudent person, and in a manner that Hodge reasonably believed was in the best interests of the corporation.  The court cannot find that, as matter of law, a five-year term was unreasonable for Brokers.  While Brokers was beginning the process of liquidating, Brokers had real property with an estimated value of over $19 million on the Petition Date, including 90 vacant lots in the Wiley Park development and 96 apartments in an apartment complex.   The assets of Brokers were certainly not liquid, and it was not unreasonable for Hodge to assume that it would take several years to wind up the corporation's affairs.

In addition, the Employment Contracts were drafted by the corporate attorney and included various protections for Brokers, including a clause providing for termination "for cause" such as willful misconduct, gross incompetence, fraud, embezzlement, or misappropriation.  Hodge presented evidence that Brokers was in need of employees to run the business subsequent to Bowers' death, and that Hodge was well qualified and experienced, and therefore of value to Brokers.  The court cannot find that Hodge's salary of $60,000.00 was unreasonable as a matter of law.   Therefore, the court cannot find that Hodge's Employment Contract was entered into in breach of Hodge's fiduciary duties.

Lastly, the court finds that Hodge has raised a genuine issue of material fact as to

27

whether "cause" existed to terminate his employment under his Employment Contract.   Based upon the foregoing, Brokers motion for summary judgment as to Hodge's claim for breach of employment contract is denied.

An Order will be entered contemporaneously with the entry of this Memorandum Opinion granting in part and denying in part Brokers' Motions for Summary Judgment.

# SERVICE LIST

Alexander Barrett
J. David Yarbrough, Jr.
P. O. Box 3463
Greensboro, NC 27402

C. Edwin Allman, III
P. O. Box 5129
Winston-Salem, NC 27113-5129

Joseph R. Beatty
R. Thompson Wright
P.O. Box 989
Greensboro, NC 27402

William E. West, Jr.
3000 Bethesda Place
Suite 703
Winston-Salem, NC 27103

Michael D. West
P.O. Box 1828
Greensboro, NC 27402