**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**WINSTON-SALEM DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **Brokers, Incorporated.** | ) | **Case No. 04-53451** |
| | ) | |
| Debtor. | ) | |
| ————————————————) | ) | |
| | ) | |
| **Carlton Eugene Anderson, et al,** | ) | **Ad. Proc. No. 04-06074** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| **Brokers, Incorporated et al,** | ) | |
| | ) | |
| Defendants. | ) | |
| ————————————————) | | |

**AMENDED MEMORANDUM OPINION**

THIS MATTER came on before the court for trial on July 22, 2008 and July 24,

2008 in Winston-Salem, North Carolina after due and proper notice.  Alexander Barrett and

Stuart Gauffreau appeared on behalf of Brokers, Incorporated ("Brokers" or "Debtor"), and

Joseph R. Beatty and R. Thompson Wright appeared on behalf of Carlton Eugene Anderson,

Terri W. Anderson and T.W. Anderson, LLC (collectively referred to as the "Anderson Parties").

Having reviewed the evidence, considered the arguments of counsel and the testimony of

witnesses, the court makes the following findings of fact and conclusions of law pursuant to Rule

7052 of the Federal Rules of Bankruptcy Procedure:

**PROCEDURAL HISTORY**

On March 9, 2004, Carlton Eugene Anderson ("Mr. Anderson") filed a Complaint against

Brokers in Guilford County Superior Court asserting claims for breach of partnership agreement,

breach of contract to convey real property, breach of employment contract, breach of obligations under a note and foreclosure on deed of trust, and for a partnership accounting and winding down.  Contemporaneously with the filing of the Complaint, Mr. Anderson filed a lis pendens.

Brokers filed an Answer asserting defenses including the statute of limitations, statute of frauds, and unclean hands and asserting Counterclaims against Mr. Anderson for constructive fraud, breach of fiduciary duty, rescission of deed, constructive trust and accounting, damages and unfair and deceptive acts under N.C. Gen. Stat. § 75-1.1.  Brokers also asserted claims for a constructive trust and accounting, unfair and deceptive acts under N.C. Gen. Stat. § 75-1.1, and damages against  Terri W. Anderson ("Mrs. Anderson") and T.W. Anderson, LLC (the "LLC").

On November 22, 2004, Brokers filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, and subsequently, the Complaint and Counterclaims were removed to this court for adjudication and resolution.  On March 8, 2007 the court entered a Memorandum Opinion and Order Denying in Part and Granting in Part Motions for Summary Judgment (the "Summary Judgment Order").  In that order, the court dismissed Mr. Anderson's claims for breach of partnership agreement, breach of employment contract, breach of contract to convey real property, breach of obligations under the note and foreclosure on a deed of trust, as well as a partnership accounting and winding down.  The court granted Brokers' motion for summary judgment on its counterclaims against Mr. Anderson for constructive fraud and breach of fiduciary duty, rescission of deed, and constructive trust and accounting.  The court denied summary judgment on Brokers' counterclaim against Mr. Anderson for unfair and deceptive acts under N.C. Gen. Stat. § 75-1.1.  The court did not include a judgment for a specific monetary amount in the Summary Judgment Order.

2

Subsequent to the entry of the Summary Judgment Order, the court entered a judgment rescinding and cancelling deeds, as well as a Consent Order Granting Brokers' Motion for Entry of an Order Enforcing the Terms of the Summary Judgment Order with respect to the Constructive Trust Claim (the "Constructive Trust Order") providing, among other things, that the Anderson Parties immediately return to Brokers any and all property of Brokers that is in their custody or control.

As a result of the foregoing, the parties agree that the only issues remaining for trial are:

(1)  Whether Mr. Anderson, Mrs. Anderson, and/or the LLC are liable to Brokers under N.C. Gen. Stat. § 75-1.1;

(2) Whether Mrs. Anderson and the LLC are jointly and severally liable to Brokers along with Mr. Anderson, whose liability has already been determined, with respect to the constructive trust claim;

(3) The amount of Brokers' actual damages;

(4) Whether Mr. Anderson is liable to Brokers for punitive damages, and if so, in what amount; and

(5) Whether the Anderson Parties are liable to Brokers for attorneys' fees and costs.

**FACT SYNOPSIS FROM SUMMARY JUDGMENT ORDER**

The court reaffirms and incorporates the Summary Judgment Order as if fully set forth herein, however for ease of reference, a summary of those findings and conclusions is set forth below:

1.  Brokers, the defendant in this proceeding, is a corporation organized and existing under the laws of North Carolina with its principal place of business in Davidson County, North

Carolina. Prior to the death of its principal and sole shareholder, Dolen Bowers ("Bowers"), Brokers operated as a real estate holding, management, and development company with assets primarily consisting of real property located in Davidson, Guilford, Montgomery, and Randolph Counties. Bowers died testate on June 6, 2003.

2. Mr. Anderson first began working with Brokers in the construction business in 1991 or 1992. On December 10, 1993, Mr. Anderson agreed to work with Brokers to develop property located at 3001 Meridian Avenue (the "Meridian Property"). This agreement was allegedly memorialized in a written contract (the "Joint Venture Agreement"), however, on summary judgment the parties disputed whether this document was ever actually executed.

3. The development of the Meridian Property was never commenced due to zoning issues, but Mr. Anderson continued to work for Brokers. Mr. Anderson asserted that in 1994, the Joint Venture Agreement was orally modified to include construction projects on other properties owned by Brokers. Nevertheless, the court found that no legal partnership existed between Mr. Anderson and Brokers.

4. The books and records of Brokers treated Mr. Anderson as an independent contractor. Accordingly, from 1993 through 2003, Mr. Anderson received weekly wages from Brokers in exchange for his labor. Eventually, Mr. Anderson was appointed Vice President of Brokers.

5. Plaintiff Nelson Kirby Hodge ("Hodge") began working as an employee of Brokers in 1998 and served as an officer of Brokers from 1999-2003. His responsibilities included supervising Brokers' rental properties, collecting rent, marketing rental properties, and supervising Brokers' operating budgets.

6. Upon the death of Bowers on June 6, 2003, Mark Preston ("Preston") and Calvin

4

Bryant ("Bryant") were appointed co-executors of Bowers' estate. The ownership of Brokers became a matter in dispute.

7. On July 6, 2003, Mr. Anderson and Hodge, the only directors of Brokers at that time, held a board meeting at which Mr. Anderson was elected President and Hodge was elected Secretary and Treasurer. Scott Gayle ("Gayle") was retained as corporate counsel.

8. On August 7, 2003, Mr. Anderson caused Brokers to transfer to himself the sum of $25,000.00. On August 18, 2003, Mr. Anderson and Hodge held a special meeting of the board of directors at which they voted in favor of a resolution providing for the sale of a promissory note executed by the Koury Corporation in favor of Brokers in the principal sum of $380,000.00 to Sherrill and Peggy Morris for the discounted sum of $372,400.00.

9. On August 26, 2003, Bowers' son, Tony Bowers, was appointed as a director of Brokers. Immediately after being named as a director, Tony Bowers participated in a special meeting during which he ratified the actions that had been taken by Mr. Anderson and Hodge as directors since his father's death. Around this same time, Mr. Anderson represented to both Hodge and Tony Bowers that he was party to a binding partnership agreement with Brokers. Mr. Anderson then presented Brokers with a request for payment in the amount of $3,070,258.30, which Mr. Anderson claimed was the amount of profit to which he was entitled pursuant to the Joint Venture Agreement.

10. On August 27, 2003, Mr. Anderson, Hodge, and Tony Bowers caused Brokers to execute a promissory note (the "Note") in favor of Mr. Anderson in the original principal sum of $2,517,611.90 which was due in full in six months. The Note was executed by Mr. Anderson as President of Brokers. To secure the obligations under the Note, Mr. Anderson also executed a

deed of trust on behalf of Brokers (the "Deed of Trust") encumbering certain real property owned by Brokers, including 18 different tracts of land, some of which consisted of multiple lots, with a value of over $3.9 million.  Hodge signed both the Note and the Deed of Trust as Secretary of Brokers.  At the same time, Hodge executed a check from Brokers' account in favor of Mr. Anderson in the amount of $370,000.00.[1]

11.  On August 28, 2003, Brokers paid Mr. Anderson an additional $182,646.00 from Brokers' account at Bank of North Carolina.  The following week, on September 2, 2003, the directors approved the sale of the Meridian Property to Mr. Anderson for $205,000.00.  Mr. Anderson paid Brokers only $41,000.00 for the Meridian Property and set off the remaining amount against amounts allegedly owed to him by Brokers.  During the six month period that Mr. Anderson acted as President of Brokers, he also used Brokers' credit card to incur charges for various personal expenses and, rather than reimburse Brokers for these personal charges, Mr. Anderson set off the amounts against the Note.

12.  The transfer of the Meridian Property, the Note, the Deed of Trust, as well as over $575,000.00 in cash and the credit of any debts owed by Mr. Anderson in satisfaction of the Note were in violation of Mr. Anderson's fiduciary duty as a director of Brokers.

13.  Mr. Anderson and Hodge continued to act as officers and directors of Brokers until on or about January 28, 2004, at which point Preston and Bryant assumed control.  In August 2004, the heirs of Bowers entered into a family settlement agreement establishing that Bowers'

---

[1] Shortly after Mr. Anderson filed the Complaint asserting claims against Brokers, Hodge filed a complaint against Brokers asserting a claim for breach of employment contract.  Brokers filed an answer and counterclaims. Eventually, an order was entered by the Superior Court consolidating the Anderson and Hodge cases, and the Hodge case was also removed to this court.  All claims between Hodge and Brokers have been settled or otherwise resolved.

estate was the sole shareholder of Brokers.

14.  All of the property transferred from Brokers to Mr. Anderson in breach of his fiduciary duties is subject to a constructive trust.  The court entered a separate order rescinding and cancelling Mr. Anderson's deed to the Meridian Property and ordered it transferred back to Brokers.

## FACTS ESTABLISHED AT TRIAL

### A. Background

1. Brokers' day-to-day business activities consisted of buying, developing, and leasing real property.  The sale of real property by Brokers was not a frequent occurrence.

2. Some of Brokers' properties were sites with environmental contamination.

3.  After the death of Bowers, on June 6, 2003, Brokers' mission was to liquidate the company to distribute cash to the beneficiaries of Bowers' estate.  During the liquidation process, Brokers focused on completing construction projects and selling the assets of the corporation.  No new projects were undertaken.  Bryant, the current Vice President and director of Brokers, testified that he expected the liquidation process to take approximately two to three years from the time of Bowers' death.

4.  In or around July 2003, Bryant informed Mr. Anderson of his responsibilities during the liquidation of Brokers.  At the time, Mr. Anderson was a member of the board of directors and President of Brokers.  Mr. Anderson's duties included finishing incomplete projects, collecting rents, maintaining properties, and preparing properties for sale.

5. Presented testimony reflects that during Mr. Anderson's directorship, he accomplished the sale of one of Brokers' properties for $600,000.00, settled a corporate condemnation lawsuit,

decreased the amount Brokers owed to BB&T and the Bank of North Carolina, and paid the 2003 ad valorem taxes.

6.  Between August 7, 2003 and December 12, 2003, Mr. Anderson transferred to himself cash belonging to Brokers in the aggregate sum of $640,586.70 in breach of his fiduciary duties to Brokers.  During that same period, Mr. Anderson made unauthorized personal charges in the aggregate sum of $13,015.22 on Brokers' Bank One Visa credit card.  The total amount of these transfers and charges is $653,601.92.

7. Bryant and a real estate attorney at Wyatt Early Harris Wheeler LLP did not discover Mr. Anderson's transfers of Brokers' property until mid or late December 2003 when they reviewed the corporate minutes from the board of directors' meetings.

8.  Mr. Anderson was terminated as an officer and employee of Brokers on or about January 4, 2004.[2]

## B.  The Constructive Trust Funds

9.  Mr. Anderson told Mrs. Anderson that the money fraudulently transferred to Brokers was money that Brokers owed to him pursuant to the Joint Venture Agreement.  As such, Mr. Anderson told Mrs. Anderson that the money taken from Brokers was actually a settlement for the breach of the Joint Venture Agreement, and that Mr. Anderson had been expecting these funds for approximately ten years.  The Anderson parties provided a signed copy of the Joint Venture Agreement as an exhibit.

10.  Both Mr. and Mrs. Anderson testified that they each felt and thought that the money was rightfully their money.

---

[2] The court notes the inconsistencies regarding Mr. Anderson's termination date; however, the exact date of termination is not necessary for the court's opinion.

8

11.  Aside from the $13,015.22 charged onto Brokers' Bank One Visa credit card, all the funds fraudulently received by Mr. Anderson from Brokers and subject to the constructive trust were originally deposited into a joint account belonging to Mr. Anderson and Mrs. Anderson at Lexington State Bank (now NewBridge Bank) and an account at Johnson City Federal Credit Union in the name of and solely controlled by Mrs. Anderson.

12. Mr. Anderson and Mrs. Anderson used $32,966.50 of Brokers' funds deposited into the Johnson City Federal Credit Union account to purchase a 2003 Ford pick-up truck (the "Truck").

13.  After Mr. Anderson caused Brokers to transfer the Meridian Property to himself, he testified that he spent approximately $25,000.00 improving the property.  These improvements included, but were not limited to, window replacements, fixing the furnace system, fixing the pool house roof, and painting.  Mr. Anderson presented no documentary evidence, such as receipts, cancelled checks, or invoices, for these expenditures.

14.  On October 15, 2003 and November 6, 2003, Mrs. Anderson, using constructive trust funds in the amount of $234,000.00 which were provided to her by Mr. Anderson, purchased two parcels of real property in Davidson County, North Carolina located at (1) Hasty School Road in Thomasville, North Carolina (the "Hasty School Road Property") and (2) 412 Council Street in Thomasville, North Carolina (the "Council Street Property").  Mrs. Anderson subsequently conveyed the Hasty School Road Property and the Council Street Property to the LLC, a North Carolina limited liability company whose sole member is Mrs. Anderson.  Mrs. Anderson regarded the Hasty School Road Property and the Council Street Property as her own given her sole ownership of the LLC.  During the time that she and the LLC owned the Council Street

9

Property, Mrs. Anderson personally collected rents of $500.00 per month from the property and spent those rents.

15.  In August 2005, the LLC sold the Hasty School Road Property and the Council Street Property to Sherrill L. Morris and Peggy T. Morris, friends of Mr. and Mrs. Anderson, for a contract price of $240,000.00 with a credit back to the purchasers of $30,000.00.  The net amount received by the LLC as a result of this sale was $208,511.27.  The Hasty School Road Property and the Council Street Property were not listed for sale with a real estate broker.  Mrs. Anderson provided deposition testimony that she also collected rents on the Council Street Property after it was sold to Sherrill and Peggy Morris.

16.  Shortly after the sale by the LLC of the Hasty School Road Property and the Council Street Property, on or about August 29, 2005, Mrs. Anderson deposited $133,740.16 into a Bank of North Carolina account in the name of the LLC.  Mrs. Anderson had the sole signature authority with respect to the Bank of North Carolina account.  On that same day, she used the remaining $74,771.11 of sale proceeds to purchase cashier's checks from the Bank of North Carolina payable as follows: (i) $50,000.00 to Hill, Evans, Duncan, Jordan and Beatty; (ii) $11,297.89 to Bank of America for payment on a credit card; (iii) $5,005.00 to Mrs. Anderson; (iv) $3,679.62 to Discover Card; (v) $4,429.55 to Platinum Plus MBNA; (vi) $450.00 to Bank of America; and (vii) $430.00 to Target National Bank.

17.  On or about September 8, 2005, Mrs. Anderson purchased three more cashier's checks, each in the amount of $5,000.00 and payable to Mr. Anderson, with sale proceeds that had been deposited into the LLC account at Bank of North Carolina.  Mr. Anderson testified that he deposited one of these $5,000.00 checks in his and Mrs. Anderson's Lexington State Bank

account, used another check to pay for work done to the Hasty School Road Property, and used the last check to pay for a vacation for himself and Mrs. Anderson.  Mrs. Anderson also purchased a cashier's check in the amount of $2,563.00 to pay for medical services rendered to Mr. Anderson.

18. Also on September 8, 2005, Mrs. Anderson withdrew $100,000.00 in cash from the LLC account at Bank of North Carolina and gave the cash to Mr. Anderson.  Mr. Anderson testified that he spent some of these funds and gave away the balance.  There is no evidence that any of these funds (or assets purchased with these funds) remain in either Mr. or Mrs. Anderson's possession.

19.  During 2003, 2004, and 2005, Mr. and Mrs. Anderson used large portions of the money he obtained in breach of his fiduciary duties to take vacations, to gamble at casinos, and to pay medical bills, credit card bills and household expenditures.

20.  Mrs. Anderson routinely paid the monthly household bills and other expenses for herself and Mr. Anderson from their joint account at Lexington State Bank.  The majority of the funds used to pay those expenses was withdrawn from the account in cash.  From 2003 to 2006, Mr. and Mrs. Anderson withdrew in cash a total of $195,244.90 from their joint accounts.

21. There is no evidence that any of the funds that Mr. Anderson fraudulently obtained from Brokers, and are subject to the constructive trust, remain in the possession of Mr. Anderson, Mrs. Anderson, or the LLC.

22.  There is no evidence that Mr. and Mrs. Anderson have any property that is traceable to the money fraudulently transferred from Brokers.

23.  In total, Mr. Anderson fraudulently obtained $653,601.92.  The parties agree that Mr.

Anderson owes $612,601.92 after crediting the $41,000.00 for the Meridian Property.[3]

**C.  The Current Financial Status of Mr. and Mrs. Anderson**

24.  Mr. and Mrs. Anderson have been married for almost nineteen years.

25.  Since Brokers terminated Mr. Anderson's employment, Mr. Anderson has not been employed or otherwise earned any money.  Mr. Anderson receives monthly disability payments.

26.  At no time has Mrs. Anderson been an officer, director, or employee of Brokers.

27.  Mr. Anderson's only other source of funds has been from a personal injury suit. Mrs. Anderson also received funds from the settlement of a personal injury claim.

28.  Mrs. Anderson worked at a cleaning service as a part-time contract employee from approximately October 2007 to February 2008.  Prior to October 2007, she last worked outside the home for compensation in 2003.

29.  Mr. Anderson testified that Mrs. Anderson earned $4,400.00 in 2007 from employment with the cleaning service.

30.  Mr. and Mrs. Anderson do not currently own a house.  Mr. Anderson testified that they live in a house owed by their friends, Sherrill Morris and Peggy Morris, and do not pay rent.

31.  Mr. and Mrs. Anderson own one vehicle, a 1997 BMW they purchased in or about 2000 or 2001.  Mr. Anderson testified that the Truck is no longer in their possession.  Mr. Anderson testified that their friends, Sherrill Morris and Peggy Morris, have possession of the

---

[3] Brokers provided documentary evidence and elicited extensive testimony from the Andersons regarding the nature of their personal expenditures; however, Brokers was unable to show that the Andersons have any constructive trust funds remaining in their possession.  While Brokers may question the Andersons' veracity, the fact remains that funds simply cannot be located.  Therefore, it is not necessary for the court to discuss in further detail how Mr. and Mrs. Anderson spent the constructive trust funds, but only that a specific amount was fraudulently transferred from Brokers by Mr. Anderson and that those funds and any proceeds thereof are no longer in Mr. and Mrs. Anderson's possession.

Truck because Mr. and Mrs. Anderson could not pay their bills, including the insurance and tag fees for the Truck. As such, Mr. Anderson testified that he and Sherrill Morris executed a $10,000.00 note on April 1, 2005 using the Truck as collateral, to enable Mr. Anderson to borrow funds for bills, including medical and credit card bills. The parties did not present evidence of the note for the court.

32. Mr. Anderson testified that he is a Veteran with multiple health problems, such as post-traumatic stress syndrome, a fractured back, anxiety disorder, and hernia problems. He is taking prescribed medications.

33. Mrs. Anderson testified that she has problems with her shoulders, back, and neck and has had multiple surgeries and treatment due to these issues such as cervical disc replacement, lower lumbar surgery and physical therapy. Mrs. Anderson is also taking prescribed medications.

## CONCLUSIONS OF LAW

**A. North Carolina Unfair and Deceptive Trade Practices Act**

**1. Mr. Anderson**

The North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), as set forth in Chapter 75 of the North Carolina General Statutes, provides that "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.1 (2005). The purpose of the UDTPA is to "provide a civil means to maintain ethical standards of dealings between persons engaged in business and the consuming public within this State[,] and [it] applies to dealings between buyers and sellers at all levels of commerce." *Bhatti v. Buckland*, 328 N.C. 240, 245, 400 S.E.2d 440, 444-45 (1991). *See also Wilson v. Blue Ridge Elec. Membership Corp.*, 157 N.C. App. 355, 357, 578

S.E.2d 692, 694 (2003) (stating that "N.C. Gen. Stat. § 75-1.1 was not meant to encompass all business activities or all wrongdoings in a business setting but 'was adopted to ensure that the original intent of the statute ... was effectuated.'"). While the UDTPA creates a private cause of action for consumers, *Gray v. N. C. Ins. Underwriting Ass'n*, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000), the protection of the UDTPA extends to businesses in appropriate contexts. *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 592, 403 S.E.2d 483, 492 (1991). *See generally* Michelle L. Evans, Annotation, *Who is a "Consumer" entitled to Protection of State Deceptive Practice and Consumer Protection Acts*, 63 A.L.R. 5th 1 (1998) (stating that "[i]n order to impose liability under a state deceptive-trade-practice and consumer-protection act, it is necessary that the injured party be a "consumer" entitled to protection under the act.").

To state a claim under the UDTPA, the plaintiff must show: "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused actual injury to the plaintiff." *Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 71-72, 653 S.E.2d 393, 399 (2007); *Gray*, 352 N.C. at 68, 529 S.E.2d at 681. The plaintiff need not "show fraud, bad faith, deliberate or knowing acts of deception, or actual deception," but only "show that the acts complained of possessed the tendency or capacity to mislead, or created the likelihood of deception." *Gress v. Rowboat Co.*, ___ N.C. App. ___, 661 S.E.2d 278, 281 (2008) (quoting *Overstreet v. Brookland, Inc.*, 52 N.C. App. 444, 452-53, 279 S.E.2d 1, 7 (1981). Ultimately "[w]hether a trade practice is unfair or deceptive usually depends upon the facts of each case and the impact the practice has in the marketplace." *Marshall v. Miller*, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981). An act or practice is unfair "when it offends established public policy" or "is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers."

14

*Gray*, 352 N.C. at 68, 529 S.E.2d at 681. Conduct constituting a breach of fiduciary duty and constructive fraud is sufficient to support an unfair and deceptive trade practices claim so long as the other elements of the claim are also present. *Spence v. Spaulding & Perkins Ltd.*, 82 N.C. App. 665, 668, 347 S.E.2d 864, 866 (1986) ("The evidence being sufficient to support plaintiffs' constructive fraud claim *a fortiori* it is also sufficient to support the unfair or deceptive trade acts or practices claim, since the evidence shows that the other element of the claim, that the practice or act affected commerce, is present." ). *See also Wilson v. Wilson-Cook Medical, Inc*., 720 F. Supp. 533, 542 (M.D.N.C. 1989); *In re Brokers, Inc.*, 363 B.R. 458, 476 (Bankr. M.D.N.C. 2007); *Compton v. Kirby*, 157 N.C. App. 1, 20, 577 S.E.2d 905, 917 (2003).  In this case, the court has already found, as set forth in the Summary Judgment Order, that Mr. Anderson's conduct constituted constructive fraud and a breach of his fiduciary duty to Brokers.  This finding is sufficient to establish that Mr. Anderson engaged in an unfair or deceptive act or practice.

Though Brokers has proven fraud, Brokers must still establish the remaining elements in a commercial context before the burden will shift to Mr. Anderson to show that the UDTPA does not apply.  *See Bhatti v. Buckland*, 328 N.C. at 243, 400 S.E.2d at 442 (stating that "[o]nce a plaintiff has proven fraud, thereby establishing prima facie a violation of Chapter 75 ... the burden shifts to the defendant to prove that he is exempt from the provisions of N.C. Gen. Stat. § 75-1.1," by citing *Powell v. Wold*, 88 N.C. App. 61, 68, 362 S.E.2d 796, 800 (1987), which is a case that took place in a commercial setting).   In this instance, the essential inquiry regarding Brokers' UDTPA claim is whether the behavior at issue affected commerce.  The behavior must affect commerce in a commercial setting, *see Powell*, 88 N.C. App. at 62-68, 362 S.E.2d at 796-

15

800 (showing the defendant, a realty and insurance company, misrepresenting information regarding factors that may adversely affect the value of property to sale the property to buyers), not in a private relationship type setting such as corporate governance issues, *Wilson v. Blue Ridge Elec. Membership Corp.*, 157 N.C. App. at 357-58, 578 S.E.2d at 694, securities transactions, *Linder v. Durham Hosiery Mills, Inc.*, 761 F.2d 162, 167 (4th Cir. 1985) (distinguishing securities transactions by stating that the other situations where the UDTPA is applicable showed defendants' anti-competitive conduct injuring the consuming public, whereas in this case, the minority shareholders were allegedly deprived of a fair market value for their stock due to a merger), or disputes arising from employment, *Durling v. King*, 146 N.C. App. 483, 488, 554 S.E.2d 1, 4 (2001). It is clear that the "alleged violators must be engaged in a business, a commercial or industrial establishment or enterprise." *Bhatti*, 328 N.C. at 244, 400 S.E.2d at 443. A "[p]laintiff must first establish that defendants' conduct was 'in or affecting commerce' before the question of unfairness or deception arises." *HAJMM*, 328 N.C. at 592, 403 S.E.2d at 492. The UDTPA defines "commerce" to include all business activities, however denominated, but not professional services rendered by a member of a learned profession. N.C. Gen. Stat. § 75-1.1(b). "'Business activities' is a term which connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized." *HAJMM*, 328 N.C. at 594, 403 S.E.2d at 493.

"Although commerce is defined broadly under G.S. § 75-1.1(b) .... 'the fundamental purpose of G.S. § 75-1.1(b) is to protect the consuming public.'" *Durling,* 146 N.C. App. at 488, 554 S.E.2d at 4 (quoting *Prince v. Wright,* 141 N.C. App. 262, 268-269, 541 S.E.2d 191, 197

(2000). *See also Linder* , 761 F.2d at 165 (stating that the apparent purpose of the act is to protect the consuming public). To "affect commerce," a defendant's allegedly deceptive acts must have a tangible effect on the marketplace. *See Esposito v. Talbert & Bright, Inc.*, 181 N.C. App. 742, 746, 641 S.E.2d 695, 698 (2007) (upholding a denial of summary judgment when no effect on commerce was alleged beyond an employee's relationship with his employer). *See also Durling*, 146 N.C. App. at 488-89, 554 S.E.2d at 4; *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 62, 554 S.E.2d 840, 848 (2001). Whether the acts in question constitute an unfair and deceptive practice in or affecting commerce is a matter of law. *United Laboratories, Inc. v. Kuykendall*, 322 N.C. 643, 664, 370 S.E.2d 375, 389 (1988); *Durling* , 146 N.C. App. at 488-89, 554 S.E.2d at 4; *Poor v. Hill*, 138 N.C. App. 19, 28, 530 S.E.2d 838, 844 (2000). *See also Walker*, 362 N.C. at 70-71, 653 S.E.2d at 399-400; *Gray*, 352 N.C. at 68, 529 S.E.2d at 681 (showing that the determination of whether an act or practice is an unfair or deceptive practice that violates § 75-1.1 is a question of law).

Brokers contends that Mr. Anderson's actions, including the conveyance of Brokers' real property to himself (the Meridian Property), the encumbrance of Brokers' real property for his benefit, his execution of the Note, and then the filing of the Complaint and lis pendens were acts in or affecting commerce that impaired Brokers' ability to carry on its day-to-day business activities and eventually forced the company to file a Chapter 11 petition.[4] More specifically,

---

[4] The court notes that the mere filing of a complaint which is objectively reasonable cannot constitute an unfair and deceptive practice. *First Union Nat'l Bank v. Brown,* 166 N.C. App. 519, 534, 603 S.E.2d 808, 819 (2004). A lawsuit is objectively reasonable if an objective litigant could conclude that the lawsuit is reasonably calculated to produce a favorable result, irregardless of the plaintiff's subjective intent. *Reichhold Chems., Inc. v. Goel,* 146 N.C.App. 137, 157, 555 S.E.2d 281, 293 (2001) (citing *Prof'l Real Estate Investors v. Columbia Pictures Indus.,* 508 U.S. 49, 60 (1993)). While this court ultimately dismissed Mr. Anderson's claims on summary judgment, finding no partnership, Mr. Anderson's lawsuit was not objectively

Bryant testified that due to Mr. Anderson's actions, Brokers did not have adequate cash flow to pay for ongoing expenses and for necessary environmental reports. He testified that Mr. Anderson's actions also prevented Brokers from borrowing money and selling its assets to liquidate the company, because Brokers was only able to sell the real property subject to Mr. Anderson's liens.

Acknowledging the spirit and purpose of the UDTPA, the court does not find that Mr. Anderson's acts were in or affecting commerce. First, Brokers' claims against Mr. Anderson do not relate to the regular business activities of the company, but to internal corporate affairs. Matters of internal corporate management do not affect commerce as defined by the UDTPA. *Wilson v. Blue Ridge Elec. Membership Corp*., 157 N.C. App. at 358, 578 S.E. 2d at 694. *See also A-1 Pavement Marking, LLC v. APMI Corp*., 2008 WL 2974103, at *6 (N.C. Super. 2008) (finding that plaintiff's accounting misdeeds that deprived defendant of proper bonus payment relate to matters of internal corporate governance, which are insufficient to sustain a UDTPA claim). Whether Mr. Anderson was Brokers' partner or an employee is an internal corporate issue, and that issue is at the root of Brokers' claims. Similarly, as a general rule, there is a presumption against unfair and deceptive trade practices claims between employers and employees. *Dalton v. Camp*, 353 N.C. 647, 658, 548 S.E.2d 704, 711 (2001). The acts of Mr. Anderson are comparable to those between an employer and an employee that do not affect commerce beyond the employment relationship. *See Durling*, 146 N.C. App. at 489, 554 S.E.2d at 4-5 (stating that "defendant's actions in withholding commissions that were owed to plaintiffs

_____

unreasonable. *See Id.* (finding that, while the lawsuit at issue was filed for no legitimate purpose, it was not "utterly baseless" and, therefore, objectively reasonable). Nevertheless, Brokers points to the Complaint and lis pendens as evidence of an unfair and deceptive trade practice.

18

were a breach of the contracts ... however, no evidence was presented that the subject transactions had any impact beyond the parties' employment relationships.").

Furthermore, the liquidation of Brokers did not constitute "business activities" as contemplated by the UDTPA, as it was not part of its regular a day-to-day, business activities. *See Wilson v. Blue Ridge Elec. Membership Corp.*, 157 N.C. App. at 358, 578 S.E.2d at 694 (finding that the "defendant was organized to provide electricity to the members of the utility cooperation" and that "alteration of its by-laws by the board of directors is not a day-to-day, regular business activity," so it does not affect commerce). Brokers was organized as a real estate holding company, with no more than an occasional sale of property. However, even if liquidation was part of Brokers' day-to-day "business activities," Brokers did not present any specific evidence that sales agreements with potential buyers were affected by the actions of Mr. Anderson, nor did Brokers show how the buyers and potential consumers of Brokers' properties were affected by the actions of Mr. Anderson. *See Durling*, 146 N.C. App. at 489, 554 S.E.2d at 4-5 (stating that the court did not find a violation of the UDTPA when the defendant withheld the plaintiff's commission and breached the contract because the plaintiff did not present any evidence that the transactions between the plaintiff and defendant had "any impact beyond the parties' employment relationship."). Simply presenting allegations that buyers were unwilling to sign sale contracts with Brokers to purchase property subject to Mr. Anderson's disclosed lien does not establish that Mr. Anderson's acts were in or affecting commerce in the spirit of the UDTPA. There was no evidence showing that the buyers were misled, over-charged, or otherwise treated unfairly in the buyer-seller relationship due to Mr. Anderson's conduct. *See Shepard v. Bonita Vista Props., L.P.*, ___ N.C. App. ___, 664 S.E.2d 388, 395 (2008) (stating

that the defendants' acts were in or affecting commerce when the defendants rented campground space to the plaintiffs on a monthly basis, and the defendants interfered with and disconnected the plaintiff's electricity, which is "at a minimum, unfair.").  Moreover, evidence showed that many of Brokers' properties were subject to serious environmental contamination, which may have served as a barrier to buyers wishing to purchase Brokers' properties, in addition to Mr. Anderson's liens.

The UTDPA was designed to protect consumers in commerce.  The court is aware that the UTDPA may extend to businesses in appropriate contexts, however, under the facts of this case, Brokers is not the sort of plaintiff intended to be protected under the UTDPA, as Brokers was not acting as a consumer in the transactions.  *See Sara Lee Corp. v. Carter*, 351 N.C. 27, 33, 519 S.E.2d 308, 312 (1999) (showing that the plaintiff, Sara Lee Corporation, was sold parts and services by the defendant under a mistaken belief that the parts and services were secured at competitive market prices; so, the court states that the plaintiff and defendant were "engaged in buyer-seller relations in a business setting," so the acts fall within the ambit of the statute.)  As such, the court finds that Brokers has not met its burden of establishing a prima facie violation of the UTDPA because Brokers has not shown how the unfair and deceptive acts or practices affected commerce.  Since the court has found that Mr. Anderson's unfair or deceptive acts were not in or affecting commerce, the court will not address whether the acts proximately caused actual injury to Brokers.

**2. Mrs. Anderson and the LLC**

Brokers also argues that Mrs. Anderson and the LLC were complicit in Mr. Anderson's unfair and deceptive acts by receiving, commingling, spending, secreting, and failing to return

funds to Brokers. As stated above, the plaintiff, Brokers, needs to show: "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused actual injury to the plaintiff." *Walker*, 362 N.C. at 71-72, 653 S.E.2d at 399; *Gray*, 352 N.C. at 68, 529 S.E.2d at 681.

The court has already decided that Mr. Anderson is not liable under the UDTPA because Mr. Anderson's actions did not affect commerce. As such, since Brokers contends that Mrs. Anderson and the LLC were involved with Mr. Anderson's unfair and deceptive acts, and the court has determined that Mr. Anderson was not liable under UDTPA, then it follows that Mrs. Anderson and the LLC are not liable under the UDTPA.

## B. Joint and Several Liability of Mrs. Anderson and the LLC with Respect to the Constructive Trust Claim

Brokers asserts that Mrs. Anderson and the LLC are jointly and severally liable, along with Mr. Anderson, in damages for the amount of funds subject to the constructive trust and not recovered. In the Summary Judgment Order, the court found that Mr. Anderson held funds transferred from Brokers in breach of his fiduciary duties[5] subject to a constructive trust in favor of Brokers. The trust funds were originally deposited into various accounts belonging to the Anderson Parties, however, there is no evidence that the Anderson Parties have possession of these funds or have possession of property that is traceable to the money. Having been unable to recover the trust funds, Brokers is entitled to a money judgment against Mr. Anderson equal to

---

[5]Through presented documents, arguments of counsel, and testimony, all parties agree that Brokers is entitled to $612,601.92 from Mr. Anderson. The amount is derived from $653,601.92 in cash transfers and credit card charges. Then the parties have subtracted $41,000.00 due to the return of the Meridian Property to Brokers and the payment of $41,000.00 made by Mr. Anderson for the purchase of the Meridian Property.

21

the amount of trust funds that has not been recovered by Brokers, *see Edgecombe Bank & Trust Co. v. Barrett*, 238 N.C. 579, 586, 78 S.E.2d 730, 735 (1953), but Brokers is also seeking a money judgment against Mrs. Anderson and the LLC, third party recipients of the constructive trust funds.

A constructive trust may be imposed "to prevent the unjust enrichment of the holder of the legal title to property acquired through a breach of duty, fraud, or other circumstances which make it inequitable for him to retain it against the claim of the beneficiary of the constructive trust." *Sara Lee Corp.*, 351 N.C. at 35, 519 S.E.2d at 313. The constructive trust "ordinarily arises out of the existence of fraud, actual or presumptive-usually involving the violation of a confidential or fiduciary relation-in view of which equity transfers the beneficial title to some person other than the holder of the legal title." *Tiber Holding Corp. v. DiLoreto*, 170 N.C. App. 662, 666, 613 S.E.2d 346, 350 (2005). *See e.g. Sara Lee Corp.*, 351 N.C. at 35, 519 S.E.2d at 313. As a general principal of equity, property subject to a constructive trust may be pursued despite changes in form so long as it remains identifiable. *Edgecombe Bank & Trust Co.*, 238 N.C. at 586, 78 S.E.2d at 735. The rule of trust pursuit is "grounded on the principle that even though the form and physical character of the property be changed, nevertheless the property ownership continues and may be asserted by the beneficial owner." *Id.* However, "the proceeds or the product of the initial property must be traced and identified through any and all intermediate transfers into the property sought to be reached; otherwise the beneficiary has only the rights and remedies of a general creditor to claim damages as for conversion or as for money had and received." *Edgecombe Bank & Trust Co.*, 238 N.C. at 586, 78 S.E.2d at 736. *See also St. Paul Fire & Marine Ins. Co. v. Seafare Corp.*, 831 F.2d 57, 58 (4th Cir. 1987) (stating that

"proceeds must be capable of being traced through any intermediate transfers, but even property which has been converted from one form to another ... may be pursued.").

In this case, as already provided for in the Constructive Trust Order, Brokers is entitled to any property in the possession of Mrs. Anderson and the LLC that Brokers can trace to the trust funds, as that money was transferred subject the constructive trust. *See Huff v. Trent Academy of Basic Ed. Inc.*, 53 N.C. App. 113, 115, 280 S.E.2d 17, 18 (1981) (showing that if it is determined that the embezzled funds were used for buildings at the academy, then the plaintiffs would have a constructive trust impressed on the academy's property, even though the academy may have been an innocent party to the transaction). Nevertheless, the court will not award a money judgment against Mrs. Anderson and the LLC equal to the amount of funds Mr. Anderson took in breach of *his* fiduciary duty.

The court imposed a constructive trust as a remedy for Mr. Anderson's constructive fraud and breach of fiduciary duties. Mrs. Anderson and the LLC did not participate in the constructive fraud and breach of fiduciary duties that gave rise to the constructive trust. Mr. Anderson owed Brokers a fiduciary duty as a director of the corporation. *See Keener Lumber Co. v. Perry,* 149 N.C. App. 19, 26, 560 S.E.2d 817, 822 (2002). In contrast, neither Mrs. Anderson nor the LLC were directors of Brokers, and Brokers has provided no other basis for finding that a fiduciary relationship existed between the parties. Further, Brokers did not carry its burden to show that Mrs. Anderson had reason to believe that the money was not rightfully earned by Mr. Anderson. Mr. Anderson informed Mrs. Anderson about a settlement from Brokers due to him after approximately ten years of employment and provided Mrs. Anderson with a copy of the Joint Venture Agreement. Moreover, the subsequent litigation from Mr.

23

Anderson was precipitated by Mr. Anderson's claim as a *plaintiff* that Brokers owed him even more money.

Brokers cites *Capital Investors Co. v. Executors of the Estate of Morrision*, 800 F.2d 424 (4th Cir. 1985), for the proposition of holding Mrs. Anderson and the LLC jointly and severally liable. However, in *Capital Investors*, the court found evidence to support the notion that the subsequent holders of the notes must have known that the notes were tainted with fraud. 800 F.2d at 428 n.6 (referring to the opinion of the prior case in the matter *Capital Investors Co*., 484 F.2d 1157, 1164-65 (4th Cir. 1973)). In this case, Brokers has not carried its burden to show that Mrs. Anderson and the LLC participated in the actions that gave rise to the constructive fraud, and Brokers has not carried its burden to show that Mrs. Anderson and the LLC knew or should have known that the money was acquired through fraud by Mr. Anderson. Of course, Mrs. Anderson and the LLC are certainly required to return to Brokers any constructive funds in their possession, in any form whatsoever, pursuant to the rule of trust pursuit. Brokers has not established that either Mrs. Anderson or the LLC owed Brokers a fiduciary duty or violated a fiduciary duty towards Brokers or committed fraud, so there is no basis for holding Mrs. Anderson and the LLC jointly and severally liable for a money judgment equal to the amount of trust funds not recovered.[6]

## C. The Amount of Brokers' Actual Damages

### 1. UDTPA

Brokers seeks damages under the UDTPA, including treble damages pursuant to N.C. Gen. Stat. §75-16. The court has found that Brokers did not successfully assert a claim under the

---

[6] Brokers did not assert or argue a claim for unjust enrichment or conversion against either Mrs. Anderson or the LLC, nor did it move to conform the pleadings to the evidence.

24

UDTPA.  As such, the court need not address the request for damages under the UDTPA.

## 2. Constructive Trust

Brokers and Mr. Anderson agree that Brokers should be allowed a money judgment in the amount of $612,601.92.  This amount is derived from the total amount wrongfully taken from Brokers by Mr. Anderson of $653,601.92, subtracting the $41,000.00 that Mr. Anderson paid for the Meridian Property.  However, Mr. Anderson asserts that the constructive trust amount should be reduced by approximately $25,000.00, the amount Mr. Anderson spent improving the property before it was transferred back to Brokers, because he acted in good faith when he purchased the property.

Mr. Anderson pursues the cause of action under N.C. Gen. Stat. § 1-340.  The statute states:

> A defendant against whom judgment is rendered for land may, at any time before execution, present a petition to the court rendering the judgment, stating he, or those under whom he claims, while holding the premises under a color of title believed to be good, have made permanent improvements thereon, and praying that he may be allowed for the improvements, over and above the value of the use and occupation of the land. The court may, if satisfied of the probable truth of the allegation, suspend the execution of the judgment and impanel a jury to assess the damages of the plaintiff and the allowance to the defendant for the improvements.   In any such action this inquiry and assessment may be made upon the trial of the cause.

N.C. Gen. Stat. § 1-340.  A party asserting a claim under § 1-340 must show: (1) the party made permanent improvements, (2) the party had a bona fide belief in good title when the improvements were made, and (3) that the party had reasonable grounds for such belief. *Pamlico County v. Davis*, 249 N.C. 648, 651, 107 S.E.2d 306, 309 (1959); *Atlantic & East Carolina Ry. Co. v. Wheatly Oil Co., Inc.*, 163 N.C. App. 748, 753-54, 594 S.E.2d 425, 429 (2004).

The court previously held that the transfer of the Meridian Property was in violation of Mr. Anderson's fiduciary duties as director of Brokers, as the court found that "Brokers has rebutted any initial presumption that Anderson acted in good faith and with the care of an ordinarily prudent person by showing that the Note, Deed of Trust, and other transfers of property from Brokers to Anderson were transactions in which Anderson had a direct financial interest." *In re Brokers, Inc.*, 363 B.R. at 473. As such, Mr. Anderson does not meet the standard of having a bona fide belief in good title when he improved the property. Moreover, even if Mr. Anderson did have a bona fide belief in good title, he presented no documentary evidence, such as receipts, invoices, or even photos, to support his claim that he expended $25,000.00 improving the Meridian Property. The court will not allow Mr. Anderson a credit for the improvements.

In addition to the $612,601.92, Brokers asserts that Mr. and Mrs. Anderson must deliver possession of the Truck to Brokers and pay an additional $10,000.00 from rents that Mrs. Anderson collected from the Council Street Property. The court has already decided that Brokers is entitled to any property in the possession of Mr. and Mrs. Anderson that can be traced to the trust funds, as that money was transferred subject to the constructive trust. The evidence supports a finding that the Truck was purchased with constructive trust funds. As such, if any of the Anderson Parties have control of the Truck, they are obligated by the Constructive Trust Order to surrender the Truck to Brokers. The Truck, however, is no longer in the possession of Mr. and Mrs. Anderson. Since the Truck is no longer in the possession of Mr. and Mrs. Anderson, Brokers must assert their state law remedies against the appropriate parties, such as Sherill and Peggy Morris, who do have possession of the Truck. Nevertheless, the court has

awarded Brokers the $612, 601.92 which includes the money taken from Brokers used to purchase the Truck.[7]

Brokers also seeks an additional $10,000.00 to account for the rents that Mrs. Anderson collected from the Council Street Property.  In this case, the Council Street Property was purchased with money taken from Brokers by Mr. Anderson.  The court has already decided that although Mrs. Anderson and the LLC did not commit fraud or violate a fiduciary duty towards Brokers, Brokers would be entitled to any funds, in any form whatsoever, including proceeds, pursuant to the rule of trust pursuit in the possession of Mrs. Anderson.  Any rents that Mrs. Anderson received are proceeds of the constructive trust and subject to the constructive trust therefore, Brokers in entitled to recover any of the rent funds that currently remain in Mrs. Anderson's possession.  Unfortunately, as with the other monies, Mrs. Anderson testified that she has spent the rent that she collected, and Brokers has not been able to trace the rents collected by Mrs. Anderson to any property.

**D. Punitive Damages**

Brokers seeks punitive damages against Mr. Anderson for breach of fiduciary duty and constructive fraud pursuant to N.C. Gen. Stat. § 1D-1.  As a preliminary matter, Mr. Anderson asserts that Brokers did not allege a claim for punitive damages in its Counterclaims and should not be allowed to assert a claim for punitive damages at this time.[8]  If the court does allow

---

[7] If Brokers is able to recover the Truck, Mr. Anderson would be entitled to have any funds received upon the sale of the Truck credited against Brokers' money judgment.

[8] North Carolina Rules of Civil Procedure require that a demand for punitive damages be specifically stated.  *See* N.C. Gen. Stat. § 1A-1, Rule 9(k).  *But see Holloway v. Wachovia Bank & Trust Co.*, 339 N.C. 338, 347, 452 S.E.2d 233, 238 (1994) (holding that "a plaintiff need not specially plead punitive damages as a prerequisite to recovering them at trial" so long as the pleading gave sufficient notice).

27

Brokers to plead punitive damages, Mr. Anderson contends that punitive damages should not be awarded in this case. If the court does allow an award of punitive damages, then Mr. Anderson requests that the factors in N.C. Gen. Stat. § 1D-35 be used to mitigate the amount of punitive damages allowed in this case.

Once a case has been removed to federal court, the complaint is subject to the Federal Rules of the Civil Procedure. *Barbee v. Cole*, 208 F.R.D. 549, 551 (M.D.N.C. 2002). This case was originally filed in state court but was subsequently removed to federal court, first the United States District Court for the Middle District of North Carolina and then the United States Bankruptcy Court for the Middle District of North Carolina; therefore, the Federal Rules of Civil Procedure apply. Under the relevant Federal Rules of Civil Procedure, made applicable to these proceedings by the Federal Rules of Bankruptcy Procedure, a pleading that states a claim need only set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). Only if a special damage is claimed, must those damages be specifically stated. Fed.R.Civ.P. 9(g). Special damages are damages that are unusual for the type of claim in question and are not the necessary result of the complained act. *Greater New York Auto. Dealers Ass'n v. Envtl. Sys. Testing, Inc.*, 211 F.R.D. 71, 78 (E.D.N.Y. 2002). The purpose of requiring special damages to be specifically stated is to prevent an unfair surprise. *Great Am. Indem. Co. v. Brown,* 307 F.2d 306, 308 (5th Cir. 1962). Punitive damages are not special damages under the Federal Rules of Civil Procedure 9(g). *E.g., Schexnayder v. Bonfiglio*, 167 Fed. Appx. 364, 367 (5th Cir. 2006); *Figgins v. Advance America Cash Advance Ctrs. of Mich., Inc.*, 482 F. Supp. 2d 861, 868 (E.D. Mich. 2007); *Nelson v. G.C. Murphy Co.*, 245 F. Supp. 846, 847 (N.D. Ala. 1965); *In re Harry Levin, Inc.*, 175 B.R. 560, 569 (Bankr. E.D.

Pa. 1994).  *But see Kingston Square Tenants Ass'n v. Tuskegee Gardens, Ltd.*, 792 F. Supp.

1566, 1579 (S.D. Fla. 1992).  Regardless, Brokers pled that it had been damaged in excess of $5

million as a result of gross mismanagement, breach of fiduciary duty, fraud, undue influence,

malfeasance and/or misfeasance, thereby affording the Anderson Parties ample notice of a

potential claim for punitive damages.  *See In re Landbank Equity Corp*. 83 B.R. 362 (E.D. Va.

1987).  As such, the court finds that Brokers may request punitive damages.

Under North Carolina law, punitive damages may be awarded to punish a defendant for

egregiously wrongful acts and to deter the defendant and others from committing similar

wrongful acts.  N.C. Gen. Stat. § 1D-1; *Harrell v. Bowen*, 362 N.C. 142, 144-45, 655 S.E.2d 350,

352 (2008).  The North Carolina General Statutes sets forth the standards for awarding punitive

damages as follows:

> (a) Punitive damages may be awarded only if the claimant proves the
> defendant is liable for compensatory damages and that one of the
> following aggravating factors was present and was related to the injury for
> which compensatory damages were awarded:
>> (1) Fraud.
>> (2) Malice.
>> (3) Willful or wanton conduct.
> (b) The claimant must prove the existence of an aggravating factor by
> clear and convincing evidence.
> (c) Punitive damages shall not be awarded against a person solely on the
> basis of vicarious liability for the acts or omissions of another.  Punitive
> damages may be awarded against a person only if that person participated
> in the conduct constituting the aggravating factor giving rise to the
> punitive damages, or if, in the case of a corporation, the officers, directors,
> or managers of the corporation participated in or condoned the conduct
> constituting the aggravating factor giving rise to the punitive damages.
> (d) Punitive damages shall not be awarded against a person solely for
> breach of contract.

N.C. Gen. Stat. § 1D-15.  If the plaintiff meets the requirements of §1D-15, the jury or trier of

fact, may determine, in its discretion, whether to award punitive damages.  *See* N.C. Gen. Stat. §

29

1D-35.  *See also Horner v. Byrnett*, 132 N.C. App. 323, 329, 511 S.E.2d 342, 346 (1999).  An award of punitive damages shall not exceed three times the amount of compensatory damages or $250,000.00, whichever is greater.  N.C. Gen. Stat. § 1D-25(b).  When determining the amount of punitive damages, the trier of fact shall consider the purpose of punitive damages stated in N.C. Gen. §1D-1 and may consider the following evidence:

> a. the reprehensibility of the defendant's motives and conduct
> b. the likelihood, at the relevant time, of serious harm
> c. the degree of the defendant's awareness of the probable consequences of its conduct
> d. the duration of the defendant's conduct
> e. the actual damages suffered by the claimant
> f. any concealment by the defendant of the facts or consequences of its conduct
> g. the existence and frequency of any similar past conduct by the defendant
> h. whether the defendant profited from the conduct
> i. the defendant's ability to pay punitive damages, as evidence by its revenues or net worth

N.C. Gen. Stat. § 1D-35.

In this case, Brokers has fulfilled the requirements of § 1D-15, by showing that Mr. Anderson is liable for compensatory damages and had committed fraud, an aggravating factor, by clear and convincing evidence. Nevertheless, after careful consideration of the facts of this case, the court has determined that it will not award punitive damages to Brokers against Mr. Anderson.  Referencing § 1D-35, the purpose of punitive damages is to punish an intentional wrongdoer for his or her acts and deter others from same conduct. N.C. Gen. Stat. § 1D-35.  Mr. Anderson's actions were the result of his belief that his partnership agreement with Brokers had been breached.  While the court has found that, as a matter of law, a partnership did not exist between Mr. Anderson and Brokers, Mr. Anderson's belief at the time diminishes the

reprehensibility of the conduct.  In addition, Brokers did not present any evidence regarding similar conduct by Mr. Anderson of this sort, and the majority of Mr. Anderson's conduct regarding transfers and breach of fiduciary duty happened over a time span of less than six months.  The court also notes that Mr. Anderson did not conceal any of the transfers and Mr. Anderson does not have the ability to pay a punitive damage award.  Mr. Anderson's testimony shows that he has no assets and minimal income, and Brokers was not able to show otherwise. The award of punitive damages is in the court's discretion, and the court will not award punitive damages to Brokers.

**E.  Attorneys' Fees and Costs**

Brokers has also requested that it be awarded attorneys' fees and costs under the UDTPA, N.C. Gen. Stat. § 6-12.5, or as part of its breach of constructive trust claim.  According to the American rule, the parties to litigation normally bear their own respective costs, unless an applicable statute or "enforceable contract" provides otherwise.  *See Travelers Cas. & Sur. Co. of America v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 127 S.Ct. 1199, 1203 (2007); *Goldstein v. Moatz*, 445 F.3d 747, 751 (4th Cir. 2006).  Brokers has asserted several grounds for the court to stray from the American Rule, including: (1) the UDTPA; (2) N.C. Gen. Stat. § 6-12.5; and (3) as part of its damages under the constructive trust theory.

**1. The UDTPA**

Brokers seeks an award of attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.1 of the UDTPA.  The court has found that Brokers did not present a successful claim under the UDTPA. As such, Brokers is not entitled to an award of attorneys' fees under § 75-16.1.

**2. Non-justiciable claim**

31

Brokers asserts that it is entitled to attorneys' fees pursuant to N.C. Gen. Stat. § 6-12.5 because Mr. Anderson pursued nonjusticiable claims. Brokers asserts that Mr. Anderson's claims against Brokers for breach of an employment contract, breach of contract to convey real property, breach of obligations under a Note, and foreclosure on a fraudulent deed of trust are all nonjusticiable claims.

A justiciable issue is one that is "real and present as opposed to imagined or fanciful." *Lincoln v. Bueche*, 166 N.C. App. 150, 154, 601 S.E.2d 237, 242 (2004) (quoting *Sunamerica Financial Corp. v. Bonham,* 328 N.C. 254, 257, 400 S.E.2d 435, 437 (1991)). "Complete absence of a justiciable issue suggests that it must conclusively appear that such issues are absent even giving the losing party's pleading the indulgent treatment which they receive on motions for summary judgment or to dismiss." *Lincoln*, 166 N.C. App at 154, 601 S.E.2d at 242 (Internal quotations omitted). If the court finds that a party pursued a claim when there is a complete absence of justiciable issue, the court may award attorney's fees to the prevailing party. *See* N.C. Gen. Stat. § 6-12.5. The statute states:

> In any civil action, special proceeding, or estate or trust proceeding, the court, upon motion of the prevailing party, may award a reasonable attorney's fee to the prevailing party if the court finds that there was a complete absence of a justiciable issue of either law or fact raised by the losing party in any pleading. The filing of a general denial or the granting or any preliminary motion, such a motion for judgment on the pleadings pursuant to G.A. 1A-1, Rule 12 a motion to dismiss pursuant to G.A. 1A-1, Rule 12(b)(6), a motion for a directed verdict pursuant to G.A. 1A-1, Rule 50, or a motion for summary judgment pursuant to G.A. 1A-1, Rule 56, is not in itself a sufficient reason for the court to award attorney's fees, but may be evidence to support the court's decision to make such an award. A party who advances a claim or defense supported by a good faith argument for an extension, modification, or reversal of law may not be required under this section to pay attorney's fees. The court shall make findings of fact and conclusions of law to support its award of attorney's fees under this section.

N.C. Gen. Stat. § 6-21.5.  The award of fees under N.C. Gen. Stat. § 6-21.5 is within the court's

discretion.  *Id.*  As an exception to the general rule that each party bears its own costs, the statute

must be strictly construed.  *Winston-Salem Wrecker Ass'n v. Barker*, 148 N.C. App. 114, 121,

557 S.E.2d 614, 619 (2001).  To impose attorneys' fees upon an unsuccessful litigant, "plaintiff

must reasonably have been aware, at the time the complaint was filed, that the pleading

contained no such issue or plaintiff must be found to have persisted in litigating case after point

when he or she should reasonably have become aware that pleading filed no longer contained

justiciable issue." *Brooks v. Giesey*, 334 N.C. 303, 309, 432 S.E.2d 339, 342 (1993).  In this

case, the court cannot find that Mr. Anderson had a reasonable belief that his legal actions

contained no justiciable issues, and the court will not award attorneys' fees under N.C. Gen. Stat.

§ 6-21.5.

**3. Breach of Constructive Trust**

Brokers asserts that it is entitled to an award of attorneys' fees expended while

attempting to recover property held by the Anderson parties in trust as part of its damages for

breach of trust, relying on *Matter of Jacobs*, 91 N.C. App. 138, 370 S.E.2d 860 (1988).  Brokers

asserts that those attorneys' fees would not have been incurred if Mr. Anderson never committed

fraud and come into possession of Brokers' property.   In *Matter of Jacobs*, attorney's fees were

awarded as part of the damages resulting from the breach of a testamentary trust.  91 N.C. App.

at 146, 370 S.E.2d at 865 ("damages for breach of trust are designed to restore the trust to the

same position it would have been in had no breach occurred").  The court finds the *Matter of*

*Jacobs* case inapplicable.  In this case, Brokers did not assert a claim for breach of trust.   Rather,

the court imposed a constructive trust for the benefit of Brokers as an equitable remedy.   As

33

Brokers did not provide the court with any other legal authority to award attorney's fees, the court will not award Brokers attorneys' fees in this particular instance.

## CONCLUSION

The court will enter a judgment consistent with the findings of this memorandum opinion as set forth herein.

October 17, 2008

*Catharine R. Carruthers*

UNITED STATES BANKRUPTCY JUDGE

# SERVICE LIST

J. Alexander Barrett
300 North Greene Street
Suite 200
Greensboro, NC 27401

Christine Myatt
P. O. Box 3463
Greensboro, NC 27402

Joseph R. Beatty
R. Thompson Wright
P.O. Box 989
Greensboro, NC 27402

William E. West, Jr.
3000 Bethesda Place
Suite 703
Winston-Salem, NC 27103

Michael D. West
P.O. Box 1828
Greensboro, NC 27402